**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**TALLEY INDUSTRIES, INC., American Investors Fund, Inc., Chestnutt Corporation, and General Time Corporation, Defendants.**

**68 Civ. 1762.**

United States District Court
S. D. New York.
June 24, 1968.

See also, D.C., 283 F.Supp. 832; 283 F.Supp. 400.

Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., John A. Dudley, Harold Sweetwood, Anthony A. Vertuno, Janet G. Gamer, Securities and Exchange Commission, Washington, D. C., for plaintiff; Mahlon H. Frankhauser, Richard V. Bandler, Edwin H. Nordlinger, Securities and Exchange Commission, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, by Walter L. Stratton, New York City, for defendant Talley Industries, Inc.; Breck P. McAllister, Roy W. McDonald, Roger W. Kapp, Robert S. Ogden, Jr., Ben Vinar, William J. T. Brown, New York City, of counsel.

O'Connor & Farber, New York City, for defendants American Investors Fund, Inc. and Chestnutt Corp.; Clendon H. Lee, New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant General Time Corp.; P. G. Pennoyer, Jr., New York City, of counsel.

WYATT, District Judge.

This is the decision after trial to the Court without a jury.

There was a motion for plaintiff Securities and Exchange Commission (SEC) for a preliminary injunction restraining in certain respects defendants Talley Industries, Inc. (Talley), American Investors Fund, Inc. (Fund) and Chestnutt Corporation. The principal relief sought by SEC was to require Talley and Fund to withdraw votes cast by them at the April 22, 1968 annual meeting of shareholders of General Time Corporation (Time).

Between December 26, 1967 and April 22, 1968, Talley bought in the open market 257,927 shares of common stock of Time; Fund in the same period bought 210,000 such shares.

The claim of SEC is that these shares were bought in violation of Section 17(d) of the Investment Company Act of 1940 (the Act; 15 U.S.C. § 80a–1 and following; Section 17(d) of the Act is 15 U.S.C. § 80a–17(d)) and of Rule 17d–1 (17 CFR § 270.17d–1) issued thereunder.

The action is brought under Section 42(e) of the Act (15 U.S.C. § 80a–41(e)) to enjoin alleged violations of that Act.

At the beginning of the hearing of the application for a preliminary injunction, the parties agreed that the Court should order the trial of the action on the merits to be advanced and consolidated with the application; this was done.

There must be judgment for defendants.

Section 17(d) of the Act makes it unlawful for "any affiliated person of * * * a registered investment company * * * acting as principal to effect any transaction in which such registered company * * * is a joint or a joint and several participant with such person * * * in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered * * * company on a basis different from or less advantageous than that of such other participant".

It will be noted that conduct, to be "unlawful" under Section 17(d) must be in contravention of some rule or regulation of SEC issued under the authority of Section 17(d).

The SEC has issued Rule 17d–1 (17 CFR § 270.17d–1) which reads in part as follows:

"(a) No affiliated person of * * * any registered investment company * * * acting as principal, shall participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit sharing plan in which any such registered company * * * is a participant * * * unless an application regarding such joint enterprise, arrangement or profit sharing plan has been filed with the Commission and has been granted * *".

The SEC has also in the same Rule (17 CFR § 270.17d–1(c)) broadly defined "joint enterprise or other joint arrangement or profit-sharing plan".

■ It seems clear that it is within the power of the SEC to require by Regulation under Section 17(d) of the Act that, unless application in advance has been made to the SEC and granted, no affiliated person of a registered investment company acting as principal shall effect any transaction in which such registered company is a joint or a joint and several participant. On the other hand, it is also clear that by the use of such expressions as "joint enterprise or other joint arrangement or profit-sharing plan" the SEC cannot widen the reach of the statute.

The effect of the Rule 17d–1 in the case at bar, therefore, is to raise the issue of the legality of the stock purchases by Fund and by Talley.

Fund is a "registered investment company" under the Act.

Talley is an "affiliated person" of Fund because at all relevant times Fund has owned between 9% and 10% of the outstanding voting securities of Talley. 15 U.S.C. § 80a–2(a) (3) (B).

The issue in this action, therefore, is whether the purchase of Time shares by Talley or Fund or both was a "transaction" effected by Talley as "principal" in which Fund was a "joint or joint and several participant".

Talley is a Delaware corporation with its principal office in Mesa, Arizona, some twenty miles from Phoenix. Its shares are publicly held and listed on the American Stock Exchange. Talley makes products for use as parts of jet aircraft and other space age systems and devices. Franz G. Talley (Franz) is president and the chief figure for Talley in the events in suit.

Fund is a New York corporation with its principal office in Greenwich, Connecticut. It is an investment company (a so-called "mutual fund") with assets, consisting of investments in portfolio companies, having a market value of some 270 million dollars. George A. Chestnutt, Jr. (George) is president and the chief figure for Fund in the events in suit.

No officer or director of Fund is an officer or director of Talley and no officer or director of Talley is an officer or director of Fund. Talley owns no shares of Fund. The shares of Talley owned by Fund were bought in the open market; there have never been any transactions between Talley and Fund.

Time is also a Delaware corporation, the common stock of which is listed on the New York Stock Exchange. The principal office of Time is in Connecticut. It makes all kinds of clocks, timing devices and related equipment.

In about April 1967, Fund sent a representative to look over the Talley plant in Arizona; later in 1967 Franz and his daughter visited the Fund offices in Greenwich and had lunch with George.

Talley has been interested in acquiring other companies; it has had "a very active acquisition program" and in this connection has consulted M. Kimelman & Company (Kimelman), a brokerage firm in New York. The chief figure for Kimelman in the events in suit was Michael Kimelman (Mike), a partner.

Franz, as custodian for his two children, had an account with Kimelman.

Mike in December 1967 became interested in Time as an investment and exercising his discretion bought for the Franz custodian account on December 22, 1967, 400 shares of Time at about $23 per share.

Franz learned of this purchase only from the confirmation slips but about the same time Mike telephoned him, discussed Time as an investment, and sent Franz a report on Time. Mike also suggested Time as a potential acquisition or merger candidate for Talley.

After studying the report, Franz gave Mike an order to buy for Talley about half to three quarter million dollars in purchase price of Time stock. Franz was seriously considering Time as a merger candidate. Mike executed the order by buying 24,800 shares on December 26 and 27, 1967.

On December 29, Franz talked to George and brought to his attention the advantages of Time as an investment for Fund, stating that Talley had bought shares of Time and that it was a possible acquisition for Talley. Undoubtedly a motive for Franz was that if acquisition or merger were attempted, shares in the hands of Fund could be presumed friendly to Talley. George broke off the conversation in order to consult counsel to Fund and did so. George then talked to Franz again and said there was no legal reason why Fund should not buy shares of Time, provided that there was no agreement with Talley as to how the shares would be voted, that Fund could dispose of its shares at any moment, that it was completely independent of Talley and had no agreement with Talley about the shares.

On January 2 and 3, 1968, Talley bought through Kimelman 42,000 shares of Time.

Franz then sent Mike to see George about January 3, 1968, and, after getting further information about Time, George decided to buy for Fund just under 10% of the outstanding shares of Time or 210,000 shares. The order to buy was given to Kimelman on January 5. It is clear that George made an independent decision for Fund to buy these shares, believing it to be a good investment for Fund. One of the factors in his investment decision was the possibility that Talley might acquire or merge with Time. It is also clear that George made an independent decision to use Kimelman as broker, largely because Kimelman already knew of Fund's interest in Time and of Talley's interest; using Kimelman would tend to limit the knowledge in financial circles that Fund was accumulating Time stock; the more widely it was known that Fund was buying Time shares, the stronger the upward effect on share prices would be; using brokers normally employed by Fund would tend to identify Fund as buying.

Between January 5 and February 15, 1968, Kimelman bought for Fund 210,000 shares of Time at an average price of $28.49 per share.

During the same period, Talley bought 35,300 Time shares and sold 50,000 shares, one block of 10,000 shares having been sold on January 17 and 40,000 shares having been sold on February 2. The sale of 10,000 shares appears to have been made at a point when Franz was considering with counsel the possibility of offering cash or Talley stock for shares of Time; he was advised that a tax-free ruling on such an offer could not be secured if Talley itself already owned a substantial number of shares bought for cash. The sale of 40,000 shares was to a friend of Franz; in the hands of the friend, the shares would be voted as Franz wished and Talley was relieved to that extent of the investment of funds.

Thus, at the time Fund completed its purchase of 210,000 shares on February 15, Talley owned 52,100 shares.

By this time Franz was definitely attempting to lay the foundation for an acquisition of or merger with Time. He learned that the record date for the annual meeting of stockholders of Time to be held in 1968 was March 1, 1968; this meant that more shares had to be acquired by Talley before that date.

On February 19 Talley, against the advice of George, made a "special bid" on the Stock Exchange for 200,000 Time shares at $36.50 per share. Talley bought 66,437 shares under this bid.

As a result of the special bid, the management of Time learned that Talley was accumulating Time shares.

There was a meeting on February 19 between Talley and Time people, during which Franz emphasized his interest in a "friendly merger".

On the same day, February 19, Time management issued a press release that the $36.50 Talley bid was inadequate; the price then went up, Talley obtained the 66,437 shares only, and the bid was terminated.

Later on February 19 Time management sent word to Franz that they had

decided to fight Talley rather than to try to arrange a "friendly merger".

On February 21, Talley bought through Kimelman 73,200 shares in the open market and in the same fashion 66,200 shares on February 23. This completed the purchases by Talley.

Talley after February 23 owned 257,937 shares of Time bought at an average cost of $38.99 per share.

On February 24, Time commenced an action in this Court (68 Civ. 768, 283 F.Supp. 400; sometimes "the first action") against Fund, Talley and others. The complaint averred that the purchases of Time stock by defendants had been in violation of Section 17(d) of the Act, of Section 13(a) of the Act, and of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a and following) and of Regulation 10b–5 issued by SEC thereunder. An injunction was asked against voting by Fund and Talley of their shares of Time, against any merger of Time and Talley, against obtaining any more shares in violation of the Act, etc.

By late February or early March 1968, Franz had determined to engage in a proxy fight for control of Time, to be determined by the election of directors of Time at the annual meeting of stockholders on April 22. Franz selected 10 nominees of an "Independent Stockholders Committee" of Time; the Committee was entirely financed by Talley and was to solicit proxies in favor of its nominees, its object being to oust the management of Time. Fund had nothing whatever to do with the decision to begin the proxy fight nor with the selection of the nominees for directors. Fund had made no commitment how it would vote its stock and was perfectly free to vote for whatever slate Fund itself decided to vote.

A list of stockholders of Time was demanded by Talley. The management of Time refused. Litigation in Delaware followed and on March 21 Talley obtained the list.

Meanwhile Talley was attempting to clear its proxy material with the SEC. Under the applicable Rules (for example, 17 CFR § 240.14a–6), proxy soliciting material must be filed with the SEC ten days before being sent to stockholders; on a showing of "good cause", however, the SEC may shorten the period (usually called, to "clear" the material), a great advantage to those soliciting.

It is here asserted for Talley, and not denied, that on March 25 someone on the staff of SEC advised counsel for Talley that, unless an application were filed under Rule 17d–1 for approval of the purchases of Time shares by Fund and Talley, the proxy soliciting material would not be cleared by the SEC; that under such compulsion, Talley agreed to file such an application; and that thereupon the proxy soliciting material was cleared.

Thus, on March 27 Talley filed an application under Rule 17d–1 describing the purchase of Time shares by it, by Fund and by others. The application requested an order by the SEC "dismissing the Application as not encompassing transactions subject to Section 17(d) or Rule 17d–1 or, alternatively, * * * finding that the transactions hereinabove described are consistent with the provisions, policies and purposes of the Act and that the participation by the Fund therein is not on a basis different from or less advantageous than that of the other participants and granting this Application of Talley to approve such participation by it * * *". On the same day Fund joined in the application.

The following note appeared at the beginning of the application:

"Talley Industries, Inc. disclaims that the transactions described herein are in any manner within the purview of Section 17(d) of the Investment Company Act of 1940 or any rule adopted thereunder and accordingly does not concede that the making of this Application, or a decision of the Securities and Exchange Commission with respect to the subject matter hereof, is required; nor does

Talley Industries, Inc. concede that the Securities and Exchange Commission has jurisdiction over the subject matter of this Application."

Having received the Rule 17d–1 application, the SEC on April 2 gave notice of a hearing on April 16 to consider the application.

On the next day (April 3), Senator Percy wrote to the Chairman of the SEC on stationery of the Senate Committee on Banking and Currency. This letter was inspired by the management of Time, as the Senator himself appears to concede, and was directed to the body which had just given notice of an impartial hearing on the Talley-Fund application. The letter spoke of the interest of the SEC in new legislation passed by the Senate last year to prevent "such abuses" as the "current takeover bid" by Talley. The evidence on which the Senator based his conclusion that Talley had committed an abuse was not given. Apparently the Senator was under the impression that it was part of the "tender offer situation", although Talley had made no "tender offer"; the "special bid" made on February 19 under Stock Exchange rules could scarcely be called a "tender offer". In any event, the Senator referred to the "possible utility of this case as one in which your Commission could make its attitude on and concern for these sorts of takeovers very clear to the business community". The Senator expressed himself as "gratified" that the SEC had taken note of "this serious situation" and had ordered a hearing. But the Senator was concerned that the April 22 meeting of Time would take place before the SEC could determine the issues and that if Talley won control there would be "considerable disruption". Therefore the Senator suggested that "action by your Commission in the Court to temporarily suspend the situation and postpone the meeting would be consistent with the maintenance of your Commission's jurisdiction in the matter". Meanwhile the Senator expressed his appreciation for the "forthright action" which the SEC

had already taken and his hope that the SEC "will make every effort to assure that the matter is resolved in a manner which recognizes the best interests of the parties involved".

Apparently the letter of Senator Percy was hand carried to the SEC which called a session for April 4 at which counsel for Time and for Talley were present. Counsel for Time urged the SEC to bring an action in the courts against Talley and apparently there was discussion of the possibility that Time itself might bring such an action.

On the following day (April 5) the SEC indicated that it would not bring the action requested. On the same day (April 5) Time itself commenced a second action (68 Civ. 1399, 283 F.Supp. 832) in this Court. Named as defendants were Talley, Fund, the independent Stockholders Committee, and others. The charge in the complaint was that the Talley proxy soliciting material was false and misleading and therefore in violation of Section 14 of the Securities Exchange Act of 1934 (15 U.S.C. § 78a and following) and Rules of the SEC thereunder. The relief demanded was substantially the same as that sought in the first action, namely, an injunction against voting by Fund and Talley of their shares of Time, etc.

On the day the second action was commenced, an order to show cause was obtained by Time to bring on a motion for a preliminary injunction. This motion by Time was heard on April 8 by Judge Tyler, who filed on April 12 an order with opinion denying the motion. Judge Tyler found that the materials sent out by Talley were "sufficiently exhaustive, concise, and, so far as the facts have been brought out in the preliminary hearing, true". Judge Tyler found that stockholders of Time could make an "informed choice" between the Time management and Talley.

On April 13, Time and The Seeburg Corporation annouced a plan to merge Time and Seeburg "contingent upon the continuation of General Time's present

management"; the terms of the proposed merger were announced.

On April 15, the SEC granted Time "leave to be heard" in the Rule 17d–1 application proceedings but denied leave to intervene.

On April 18, Judge Bryan filed an order with opinion dismissing the first action brought by Time. Judge Bryan found that Time had no standing to sue under the Act because the Act was intended to protect those having an interest in the registered investment company (Fund), specifically that Section 17(d) "was intended to protect the Fund shareholders from having their company enter into transactions with affiliates on inequitable terms". Judge Bryan rejected any claim under Rule 10b–5 because Time, the corporation, could not be injured "in a takeover situation" and that "incumbent management has no protected interest in remaining in power".

George studied the proposed Time-Seeburg merger and found it very unattractive, estimating the value given in the merger to be about $28 per Time share against a then market value of about $35 per share. George accordingly issued a statement for Fund on April 18 that he would recommend voting Fund's stock in favor of the Talley slate and the Fund directors so decided.

The hearing before the SEC Hearing Examiner on the Rule 17d–1 application took place on April 16, 17 and 18, being concluded in the evening of April 18. Apparently having in mind the April 22 stockholders meeting of Time, the Hearing Examiner referred the matter at once to the Commission. There was oral argument before the Commission beginning at 2:30 in the afternoon of Friday, April 19. Before the argument began it was announced that a majority of the Commission had "tentatively determined" that there had been a "joint arrangement" between Talley and Fund in violation of Section 17(d) of the Act and of Rule 17d–1 and that there was no "warranty" for any retroactive approval. Counsel were advised to address themselves to "those questions". The oral argument concluded at 3:45 p. m.

The Commission at about 5:00 p. m. on the same day (April 19) made its "Memorandum Opinion and Order". It was found that the "broad language" of Section 17(d) and Rule 17d–1 indicated that the term "joint arrangement" (which does not appear in the statute but only in the Rule) "should not be given a narrow interpretation". It was found that Talley and Fund had carried out a "joint arrangement" and that purchase by Talley of Time shares "pursuant to its joint arrangement was accordingly in violation of the Act". The "joint application" was denied.

There was no finding by the SEC that purchases by Fund were in violation of the Act. The significance of this omission will appear.

Armed with the order of the SEC, Time now made haste to this Court and in the second action appeared before Judge Tyler at ten o'clock in the morning of Monday, April 22. The Annual Meeting of Time was scheduled to begin at two in the afternoon of that day at Stamford, Connecticut. On the basis of the SEC order, Time asked Judge Tyler to enjoin Talley from voting its shares and proxies or alternatively to adjourn the meeting. After full argument, Judge Tyler that morning declined to issue any injunction.

The meeting of stockholders of Time was duly held on April 22.

This action was commenced by the SEC on May 1.

The hearing and trial took place on May 21 and 22.

According to testimony at the trial, the counting of ballots had by that time proceeded far enough to indicate the election of the Talley nominees as directors of Time; apparently there has been no "validation" of any results, pending determination of this action.

The SEC allowed itself to be persuaded, unwisely as it seems to me, to throw its weight on the side of one of two contending factions in a situa-

tion where the stockholders of Time—the real parties in interest—were being given an opportunity, as Judge Tyler found, in the exercise of corporate democracy to make an "informed choice".

The wisdom of the SEC action, of course, is not one for me to decide. The sole issue is simply: did the purchases by Fund or Talley or both violate Section 17(d) of the Act?

Careful study has been given of the arguments for the SEC and for Time and no merit can be found in any of them.

Three points can be put to one side in the beginning.

■ First, it is not possible as a matter of law for purchases by Fund to be in violation of Section 17(d). This is because that Section only makes unlawful an activity by an "affiliated person", in this case Talley, and does not make unlawful any activity of "a registered investment company", in this case Fund. The SEC itself appears to recognize this because its April 19 order finds only that purchases by Talley were in violation of Section 17(d) and significantly omits that purchases by Fund were in violation of the Act.

■ Second, Rule 17d–1 to the extent that it goes beyond Section 17(d) is invalid because without authority. Therefore, the words of the Rule, "joint enterprise or other joint arrangement or profit-sharing plan", and the definition of those words cannot serve to extend the sweep of the Act. The Rule is valid, however, if applied to a situation covered by Section 17(d).

■ Third, the determinations made by the SEC in its April 19 order need not be accepted by this Court. Naturally, findings of fact and conclusions of law by the able and conscientious Commissioners who acted here will be given respectful consideration, as has been done. But this is an independent civil action commenced by the SEC as a litigant in this Court, under authority of Section 42(e) of the Act (15 U.S.C. § 80a–41(e)). It is not a judicial review of an order under Section 43 of the Act (15 U.S.C. § 80a–42) and even if it were, judicial review would be meaningless if the Court were obliged to accept the determinations in the order of the SEC. The case at bar is brought under a statute virtually the same as that under which SEC v. Frank, 388 F.2d 486, at 491 (2d Cir. 1968) was brought and in which Judge Friendly said:

"The language here, however, like that in other statutes, * * * authorizes the Commission to bring an action for an injunction 'whenever it shall appear' to it that a violation is or is about to be committed; it does not specify whether a court should give weight to the Commission's judgment, simply stating that upon 'a proper showing' an injunction 'shall be granted.' Such bland language affords no sufficient basis for concluding that Congress meant special weight to be given the Commission's decision to allow its staff to institute suit. If Congress wishes to go further, it should say so in language all can understand."

■ The remaining question, decisive of the action, is whether in its purchases of Time shares, Talley "as principal" effected a "transaction" in which Fund was a "joint or joint and several participant".

That Talley, when it bought Time shares, acted "as principal" and effected a "transaction" is plain. It seems equally plain that Fund was not "a joint or a joint and several participant" with Talley in the "transaction" of purchase. Fund has no financial interest of any sort in the shares of Time bought by Talley nor any agreement, understanding or commitment of any sort ever to have any such interest. There is no conceivable way by which Fund can be in any way affected financially by the purchase by Talley of the shares.

The purchases by Talley of shares of Time were not within the language of

Section 17(d) and no application to the SEC was required, or could be required by the SEC, under Rule 17d–1 or otherwise.

While this disposes of the action, a few words may be added.

Our Court of Appeals, through Judge Friendly, has not long ago spoken aptly about the Act (Willheim v. Murchison, 342 F.2d 33, 42 (2 Cir. 1965)):

> "The Investment Company Act, the product of joint effort and compromise by the SEC and the industry, was drafted with a good deal of specificity; a court should give it a hospitable reception but ought not expand its words beyond their natural meaning to bring within its sweep a transaction, such as that here at issue, which is not the 'mischief and defect' aimed at by the Act and which it is doubtful that Congress would have wished to include if it had considered the problem".

The situation in the case at bar is not even remotely a "mischief and defect" at which Section 17 is aimed.

Section 17, as Judge Friendly in *Willheim* elsewhere (at 40) pointed out, was aimed by Congress at "certain kinds of self-dealing".

█ The "self-dealing" at which Section 17 was aimed was that between the investment company and insiders.

The Act was passed in 1940 after a monumental study of investment companies had been made by the SEC, naturally with special emphasis on the mischiefs and defects revealed after the stock market crash in 1929. One of these, at which Section 17 was directed, was described by one of the draftsmen of the Act, as follows (Jaretzki, The Investment Company Act of 1940, 26 Wash.U.L.Q. 303, 307, 317–18 (1941):

> "Dealings *between* investment companies and affiliated persons * * * also made possible improper transactions by the unscrupulous". (emphasis added)
>
> \* \* \* \* \* \*
>
> "The charge had been made that investment companies frequently were

operated, not primarily in the interests of their stockholders, but in the interests of controlling groups or groups represented on the board of directors. Specifically, there have been instances of investment houses selling securities to affiliated investment companies under circumstances which at worst constituted a conscious unloading of securities on the investment company and at best a bad bargain for the investment company."

On the same subject, the SEC Report to Congress itself said (Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Part Three, "Abuses and Deficiencies in the Organization and Operation of Investment Trusts and Investment Companies" 22 (1939)):

> "While the losses in a number of investment companies were attributable principally to the security market decline and general business decline, in many cases the substantial losses sustained by investment companies were the result of the numerous transactions which the sponsors, managers, officers, directors, and other controlling interests effected for their own account with the investment companies which they dominated."

The SEC has more recently described the aim of Section 17(d) as follows:

> "[R]egulate certain situations where persons making the investment decisions for the registered * * * company may have a conflict of interest and the danger exists that the investment company * * * may be overreached by such affiliated persons * * *." Investment Company Act Release No. 5128 (October 13, 1967).

Judge Bryan, in dismissing the first action brought by Time in this Court, stated with specific reference to Section 17(d):

> " * * * the proscription of unapproved joint arrangements with affiliates was intended to protect the Fund shareholders from having their company enter into transactions with affiliates on inequitable terms."

When Talley bought its Time shares here, there was no possibility that Fund would be "overreached" or that "inequitable terms" would be imposed on Fund. The purchases had no financial effect on Fund and never could have. Fund had no interest of any sort in the shares bought by Talley.

True, Fund itself in separate transactions bought on its own judgment and solely for its own account 210,000 shares of Time. For all that appears, Fund made a good investment. (While irrelevant, it may be noticed that the average cost to Fund of its Time shares was $28.49 per share while the average cost to Talley was $38.99 per share.) In any event, whether Fund made a good investment or not, Section 17(d) does not apply to Fund, the "registered investment company".

What has been written above contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The Clerk is directed to enter judgment dismissing the action as to all defendants.

So ordered.