SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

Martin FRANK, Defendant-Appellant,

and

Nylo-Thane Plastics Corp., Maurice Minu-
to, Olanda Minuto, Louis Braunston,
Leonard Freedman, Defendants.

No. 169, Docket 31667.

United States Court of Appeals
Second Circuit.

Argued Nov. 14, 1967.

Decided Jan. 22, 1968.

Sidney Feldshuh, New York City, for defendant-appellant, Richard Weinberger, New York City, on the brief.

Edward B. Wagner, Sp. Counsel (Philip A. Loomis, Jr., Gen. Counsel, Ellwood L. Englander, Asst. Gen. Counsel, Janet G. Gamer, Atty., Washington, D. C.), for Securities and Exchange Commission.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge:

Martin Frank, an attorney, appeals, 28 U.S.C. § 1292(a) (1), from a temporary injunction issued by Judge Tyler in the District Court for the Southern District of New York, in an action by the SEC with respect to alleged violations of the fraud provisions of the securities laws, § 17(a) of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934. The order enjoined Frank *pendente lite* from "drafting or causing to be drafted any offering circular, prospectus or other document or writing containing any untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, concerning Nylo-Thane Plastics Corp.'s principal product, a chemical additive ingredient purportedly designed to reduce the time required in curing rubber * * *."

Nylo-Thane, a defendant in this action, had acquired from Maurice Minuto, whose wife owned two-thirds of its stock, a chemical additive designed to accelerate the curing of rubber. During 1966 it sold 100,000 shares at $3 per share in what purported to be an intra-state offering, in connection with which Minuto had retained Frank to represent it. An offering circular dated October 31, 1966, and an amended offering circular dated March 9, 1967, contained, under the heading "Business of the Company," references to the additive which are reproduced in the margin.[1] Immediately after

1. "To demonstrate the efficacy of the product, and to determine its value to rubber manufacturers, sample quantities of the additive were made available by others to producers of rubber and rubber-like tires, bowling balls, battery cases, seals, gaskets, sheets, molded parts, extrusions, tubing, etc., for testing purposes. It was found that the use of the additive in compounds specified by these manufacturers resulted in finished products cured in fractions of the time currently deemed normal for this procedure. Moreover, it was found that the physical properties of the items produced with the additive included in the formulation were at least equal, and in numerous cases superior, to those of the same compounds when cured at longer time cycles without the additive, while increasing processing safety. The effect of this time-saving was, in each case tested, a substantial reduction in molding time costs; and, more important-

ly, also released the molds and presses for further production, thereby increasing the productive capacity of the manufacturer without capital investment of any kind whatsoever on his part. In short, the use of the additive was effectively shown, through practical factory testing, to make it possible for a fabricator of rubber or rubber-like products to turn out substantially larger quantities of such products without higher costs for plant, machinery or labor, by reason of the greatly reduced curing time effected by the use of such additive.

"According to available statistics from the United States Department of Commerce, upwards of five billion pounds of natural and synthetic rubber are processed annually in the United States. Practically all of such processing necessitates curing, so that the potential market for the additive, in view of its proven value in speeding and increasing produc-

completion of the offering the stock rose as high as $17.50 per share.

On learning what it considered to be serious misrepresentations in the offering circular with respect to the additive, the SEC, on April 27, 1967, suspended trading in the stock. The company retained a new securities law specialist, who worked out with the Commission a letter correcting the misrepresentations. On May 26 the Commission instituted this action against the company, three officers or stockholders, a financial consultant, and Frank, to enjoin further misrepresentations. All the defendants save Frank, while neither admitting nor denying the allegations of the complaint, consented to entry of a permanent injunction. The Commission thereupon announced that it would not continue the suspension beyond May 27, when the current 10-day suspension order expired, advising investors to "consider carefully information made available by the company concerning its product and information made available in connection with the Commission's injunctive action before effecting transactions in this stock." Securities Exchange Act of 1934 Release No. 8089.

Frank having declined to join the other defendants in consenting to an injunction, the Commission on June 20 moved for a temporary injunction against him. The motion was supported by numerous affidavits and extracts from testimony by Frank and others at an administrative hearing which were alleged to show that he had been aware of the falsity of representations concerning the additive. Frank countered with a notice to take the depositions of various employees of the Commission, as to which the Commission obtained a stay, and with answering affidavits of himself and others. His position, broadly stated, was that the portion of the offering circular alleged to misrepresent the additive had been prepared by the officers of Nylo-Thane and that his function had been that of a scrivener helping them to place their ideas in proper form. Further affidavits were filed by both sides and the SEC's application was argued on July 19. Judge Tyler endorsed on the motion papers a memorandum opinion granting the injunction [2] and this later issued.

Although Frank makes much of this being the first instance in which the Commission has obtained an injunction against an attorney for participation in the preparation of an allegedly misleading offering circular or prospectus, we find this unimpressive. As this court said in United States v. Benjamin, 328

tion, appears to be of considerable proportions, even if only a small percentage of the rubber fabricators adopt its use in their formulations. It is, of course, highly speculative and quite impossible to estimate how much, if any, of this potential market will actually become users of the additive and customers of the Company. However, again assuming that even a small percentage of the manufacturers comprising this market will adopt the use of the additive on the basis of its proven productive value, the Company envisions potential sales of its product in quantities of millions of pounds, which, if realized, would result in a large volume of sales and a considerable potential profit. Management has tentatively fixed the sales price of its additive product to provide a reasonable return to the Company and at the same time should constitute an appealing cost to the prospective buyer, in view of the additive's ability to raise productive capacity in a degree substan-

tially exceeding the expense of its usage in production."

"The Company's additive was subjected to various tests by the United States Army laboratory at Natick, Massachusetts as well as by a number of leading rubber companies. While the Company was extremely satisfied with the results, there is no assurance that the results of the test will bring the Company any orders for the additive."

2. This was as follows:
"After hearing today, I am convinced that the affidavits of the Commission establish a likelihood of success in establishing knowing violations of Section 17a, of the Securities Act of 1933 and a need pending this litigation to prevent any further possible misstatements in offering circulars and writings relating to Nylo-Thane Plastics Corp. securities. A narrowly drawn injunction order as described by the Court during argument should be settled on notice."

F.2d 854, 863 (2 Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964), "In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar." A lawyer has no privilege to assist in circulating a statement with regard to securities which he knows to be false simply because his client has furnished it to him. At the other extreme it would be unreasonable to hold a lawyer who was putting his client's description of a chemical process into understandable English to be guilty of fraud simply because of his failure to detect discrepancies between their description and technical reports available to him in a physical sense but beyond his ability to understand. The instant case lies between these extremes. The SEC's position is that Frank had been furnished with information which even a non-expert would recognize as showing the falsity of many of the representations quoted in fn. 1, notably those implying extensive and satisfactory testing at factories and indicating that all had gone passing well at the test by the Army Laboratories. If this is so, the Commission would be entitled to prevail; a lawyer, no more than others, can escape liability for fraud by closing his eyes to what he saw and could readily understand. See Bentel v. United States, 13 F.2d 327, 329 (2 Cir.), cert. denied, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926); United States v. Benjamin, supra, 328 F.2d at 861. Whether the fraud sections of the securities laws go beyond this and require a lawyer passing on an offering circular to run down possible infirmities in his client's story of which he has been put on notice, and if so what efforts are required of him, is a closer question on which it is important that the court be seized of the precise facts, including the extent, as the SEC claimed with respect to Frank, to which his role went beyond a lawyer's normal one, Compare Securitites Act of 1933, § 11 (a).

Although the moving affidavits of the SEC investigator and others gave ample basis for belief that the circular conveyed what executives of Nylo-Thane must have known to be a misleading impression of the extent to which the additive had proved valuable in practice or even in theoretical testing, the only specific statements as to what Frank knew were that he had seen letters from Genruco Processing Co. and the Army, dated December 6, 1965, and August 4, 1966, respectively, and that Braunston, president of Nylo-Thane, had told him that the Army tests indicated use of the additive resulted in "sulphur bloom" and that "the Company cannot always guarantee that the additive will work."

While the letter from Genruco was not in the SEC's papers, the investigator quoted a statement "that there had not been enough time to have all the physical * * * (properties) * * * checked out." The Army report recited favorable effect with one rubber compound, lack of effect with another, but "prominent blooming" in the former. An answering affidavit of Braunston gave the text of the letter from Genruco a portion of which, not quoted by the SEC investigator, was highly enthusiastic about the additive but which did clearly indicate that factory trials were yet to be made. Braunston added a letter from Vulcanized Rubber and Plastics Co., dated November 30, 1966, given to Frank, which was also optimistic, and denied making the statements the investigator had attributed to him. An answering affidavit by Minuto included a report from Armstrong Rubber Co. dated June 10, 1965, of a rather technical nature, allegedly shown to Frank and claimed to differ materially—to the advantage of the additive—from one described in an affidavit of an Armstrong chemical engineer which the SEC had submitted. Minuto also denied that he or Braunston had ever mentioned "sulphur bloom" to Frank, and asserted that the phenomenon was due to the Army's using a compound with excessive sulphur content and could easily be corrected. A reply affi-

davit of the SEC investigator sought to respond to these and other claims; among other things it cited testimony by Minuto at an administrative hearing that he had told Frank about the sulphur bloom, and contended that Minuto had told Frank that the additive tested by the Army reduced the abrasive resistance of the final product and that Braunston had reported that the Army tests were inconclusive. Supplemental affidavits submitted by Frank's lawyer and by Braunston sought to rebut these charges.

■ Frank contends that the order granting a preliminary injunction is procedurally defective in two respects. First, no evidentiary hearing was conducted though the affidavits revealed a dispute about the critical facts. Second, the judge's memorandum did not set forth adequately the necessary findings of fact as required by Rule 52(a).[3]

Decisions on the extent to which F.R. Civ.P. 65 requires a district court to take evidence rather than rely on affidavits before granting or refusing a temporary injunction reflect a tension between the need for speedy action and the desire for certainty and complete fairness. In recognition of the former, Rule 65(b) authorizes a temporary restraining order which may be issued without a hearing. But see Arvida Corp. v. Sugarman, 259 F.2d 428, 429 (2 Cir. 1958) (concurring opinion of Judge Lumbard). During the twenty-day period for which such an order may run, the judge must conduct a "hearing" on a temporary injunction "at the earliest possible time," and at the end of this period he must make a decision conforming with the procedural requirements of the Rules. One standard with respect to the taking of evidence derivable from this framework is that where interlocutory relief is truly needed, Rule 65 demands such but only such thoroughness as a burdened federal judiciary can reasonably be expected to attain within twenty days. Where there is less urgency, as the SEC's failure to seek a temporary restraining order and other circumstances show to have been the case here, the standard may well be higher. Indeed, in such instances the district judge should carefully consider the possible desirability of invoking the power expressly conferred by F.R.Civ.P. 65(a) (2) as amended to "order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" for interlocutory relief.

While it may be impossible to reconcile all the apparently conflicting statements as to the need for taking evidence before issuing a temporary injunction, see 7 Moore, Federal Practice ¶ 65.04 [3]; Sims v. Greene, 161 F.2d 87, 88–89 (3 Cir. 1947); Ross-Whitney Corp. v. Smith, Kline & French Laboratories, 207 F.2d 190, 198 (9 Cir. 1953); cf. Behre v. Anchor Insurance Co., 297 F. 986, 991 (2 Cir. 1924), analysis of the differing problems presented in such cases may dissipate at least some of the confusion. In many instances there is no serious dispute about the facts; the issues, perhaps very troublesome ones, concern the meaning and applicability of a statute or common law rule. The taking of evidence would serve little purpose in such cases; argument is what the judge requires. In another group there is little dispute as to the raw facts but much as to the inferences to be drawn from them, as well, perhaps, as to the meaning and applicability of the governing statute or common law rule. Although an evidentiary hearing would be of more value in such cases and should be held whenever practicable, it will sometimes be apparent that the magnitude of the inquiry would preclude any meaningful "trial-type" hearing within twenty days. Judge Frank's much cited opinion in Hamilton Watch Co. v. Benrus Watch Co., 206 F. 2d 738 (2 Cir. 1953), affords an example. Although, in fact, the plaintiff called two

---

3. "In all actions tried upon the facts without a jury * * * the court shall find the facts specially and state separately its conclusions of law thereon * * * and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action. * * *"

witnesses, 206 F.2d at 739, this court's affirmance of a temporary injunction did not rest on that but rather on the view that where the balance of hardships tips decidedly toward the plaintiff, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation," 206 F.2d at 740 —a thoroughly sound position where as in that case the hearing would have had to examine the economic characteristics of a substantial industry and the injunction merely preserved the *status quo*. See United States v. Aluminum Company of America, 247 F.Supp. 308 (E.D.Mo. 1964), final judgment affirmed, 382 U.S. 12, 86 S.Ct. 24, 15 L.Ed.2d 1 (1965); McIntyre, Antitrust Injunctions: A Flexible Private Remedy, 1966 Duke L.J. 22, 26–27. At the other end of the spectrum are cases where everything turns on what happened and that is in sharp dispute; in such instances, the inappropriateness of proceeding on affidavits attains its maximum and, even if the plaintiff's need is great, it will normally be possible for the judge within the allotted time to conduct a hearing that will illuminate the factual issues although probably not settling them. Quite evidently this case comes closer to the last example than to the two first hypothesized; indeed the lack of urgency, already noted and further developed below, makes it an *a fortiori* one.

The Commission says that, however all this may be in private litigation, a less strict standard as to the need for taking evidence prevails when suit has been brought by an agency representing the public interest. Congress is, of course, free, within the broad limits of due process, to dispense with the requirement of an evidentiary hearing when a federal agency seeks an interlocutory injunction. But the courts have required Congress to speak clearly if it desires to modify basic principles governing equitable relief. See Hecht Co. v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L. Ed. 754 (1943); Note, The Statutory Injunction as an Enforcement Weapon of Federal Agencies, 57 Yale L.J. 1023, 1026–34 (1948). And Congress has done so in some instances, see, e. g., Labor Management Relations Act § 10(e), 29 U.S.C. § 160(e); Douds v. Int'l Longshoremen's Ass'n, 242 F.2d 808 (2 Cir. 1957). The language here,[4] however, like that in other statutes, e. g., Atomic Energy Act, 42 U.S.C. § 2280; Federal Power Commission Act, 16 U.S.C. § 825m(a); cf. FPC v. Arizona Edison Co., 194 F.2d 679 (9 Cir. 1952), authorizes the Commission to bring an action for an injunction "whenever it shall appear" to it that a violation is or is about to be committed; it does not specify whether a court should give weight to the Commission's judgment, simply stating that upon "a proper showing" an injunction "shall be granted." Such bland language affords no sufficient basis for concluding that Congress meant special weight to be given the Commission's decision to allow its staff to institute suit. If Congress wishes to go further, it should say so in language all can understand.

It is true that cases where a government agency seeks interlocutory relief may often be of one or the other of the first two types discussed above; an evidentiary hearing is not required when the dispute concerns only "legislative facts," see 1 Davis, Administrative Law Treatise, § 7.06, or it is evident that the breadth of the issue having to be explored would prevent a meaningful

---

4. Both section 20(b) of the Securities Act of 1933 and section 21(e) of the Securities Act of 1934 read as follows:

"Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond * * *."

"trial-type" hearing within the allotted time.[5] But where, as in this case, issuance of an injunction on the ground of fraud turns on the knowledge and intent of an individual during a short period of time, we perceive no basis for dispensing with the evidentiary hearing normally required simply because the plaintiff is a government agency, for whose vigorous efforts to eradicate securities abuses this court entertains the highest respect. Rather, we follow the early ruling in SEC v. Andrews, 1 SEC Jud.Dec. 265 (S.D.N.Y.1936), where Judge Mack denied a temporary injunction under the 1934 Act when the affidavits revealed a factual dispute as to the defendants' intent, concluding that "while in my opinion, it is not unreasonable to infer that the orders were entered 'for the purpose of creating a false or misleading appearance of active trading' * * * I am loath, merely on affidavits, to deem such an inference so clear or irresistible in this case as to justify the granting of a preliminary injunction." Id. at 269. See also, SEC v. A. G. Bellin Securities Corp., 171 F.Supp. 233 (S.D.N.Y.1959).

The *per curiam* opinion in SEC v. Boren, 283 F.2d 312 (2 Cir. 1960), upon which the Commission strongly relies, is not to the contrary. The court there reiterated the settled principle that "a cessation of the alleged objectionable activities by the defendant in contemplation of an SEC suit will not defeat the district court's power to grant an injunction restraining continued activity." Id. at 313. Once that was recognized, issuance of the injunction without an evidentiary hearing was clearly proper since Boren did not dispute his participation in the objectionable activities for over a year. Neither does F. T. C. v. Rhodes Pharmacal Co., 191 F.2d 744 (7 Cir. 1951), reversing a trial court's denial of a temporary injunction because opposing affidavits revealed a serious factual dispute, sustain the weight the Commission puts on it. This court, in F. T. C. v. Sterling

Drug Inc., 317 F.2d 669, 678 (1963), expressly refused to decide whether its teaching should be followed. In any event, the case is distinguishable. The majority regarded the language of § 13 (a) of the Federal Trade Commission Act, which authorizes the F. T. C. to seek a preliminary injunction whenever "it has reason to believe" it would be "to the interest of the public" to enjoin dissemination of a false advertisement or drug pending a full administrative hearing, as showing a Congressional intention to modify normal equitable standards; the combination of an administrative determination before the bringing of suit and the committing of the ultimate decision to the agency subject to normal judicial review afforded a much stronger basis than anything in the securities laws for holding that a court, on an application for a temporary injunction, was not to make the very decision confided to the agency. Finally, we do not regard Bowles v. Montgomery Ward & Co., 143 F.2d 38 (7 Cir. 1944), where the same court had upheld a temporary injunction under § 205(a) of the Emergency Price Control Act of 1942, 56 Stat. 23 (1942), which this court cited, along with *Benrus*, in SEC v. Boren, supra, as inconsistent with our present decision. In that case the Price Administrator called witnesses in addition to submitting affidavits, the trial judge announced his satisfaction with the appearance, demeanor, training and experience of the witnesses and the defendant adduced no contrary evidence. In any event, decisions enforcing the wartime Emergency Price Control Act afford a rather tenuous basis for reasoning in other areas, see 143 F.2d at 43.

We hold, on similar grounds, that the judge's conclusion, see fn. 2, that "the affidavits of the Commission"—apparently considered without regard to Frank's—"establish a likelihood of success in establishing knowing violations of Section 17a of the Securities Act of

5. A familiar instance where these factors co-exist is an action by the United States for an emergency injunction under § 208 (a) of the Taft-Hartley Act. See United Steelworkers of America v. United States, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959).

1933," did not satisfy Rule 52(a). No one could reasonably demand that a judge pause overlong for detailed findings before issuing a temporary injunction if some gigantic fraud impended or the welfare of the nation was at stake, although courts have taken the time to make findings in such a case, see, e. g., United States v. United Steelworkers of America, 271 F.2d 676, 683–688 (3 Cir.), aff'd, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (1959); United States v. National Marine Engineers' Beneficial Ass'n, 294 F.2d 385 (2 Cir. 1961). However, the circumstances here were about as unexigent as could be imagined. The misleading statements had been corrected to the Commission's satisfaction, the company and its officers had consented to a permanent injunction against their repetition, and Frank had been at least temporarily superseded in Nylo-Thane securities matters by another lawyer. Indeed his senior partner and counsel asserted on the argument before us that he had offered to stipulate in the district court that Frank would not take part in any legal work concerned with Nylo-Thane offerings until the injunction action was finally determined. The absence of imminent danger bears heavily on the extent to which the court may dispense with a procedural safeguard designed by the Supreme Court to be applied to the maximum extent feasible.

While "findings 'are not a jurisdictional requirement of appeal' but only 'aid appellate courts in reviewing the decision below,'" Rossiter v. Vogel, 148 F.2d 292, 293 (2 Cir. 1945), quoting from Hurwitz v. Hurwitz, 78 U.S.App.D.C. 66, 136 F.2d 796, 799 (1943), such aid is precisely what we lack here. The propriety of an injunction against Frank turns in no small measure on what he actually knew and did, and the conflicting affidavits, together with the absence of findings, leave us in the gravest doubt just what the district judge thought the facts to be. For this reason we cannot say the failure to make findings was harmless as in Leighton v. One William Street Fund, Inc., 343 F.2d 565, 567 (2 Cir. 1965). Compare Huber Baking Corp. v. Stroehmann Brothers Co., 208 F.2d 464, 467 (2 Cir. 1953); Mallory v. Citizens Utility Co., 342 F.2d 796, 798 (2 Cir. 1965). Here again if there is to be some tempering of the wind in actions involving the public interest, this must depend upon an appropriate weighing of all relevant factors and not on the simple fact that a government agency is the plaintiff. If the judge's failure to make findings rested on the view that the pertinent securities statutes withdrew the case from F.R. Civ.P. 52(a), we think he was mistaken, for reasons previously discussed.[6]

The judgment is reversed for further proceedings consistent with this opinion.

6. While we have noted the contention of the SEC that Frank waived any objection to the court's proceeding on the basis of affidavits, our upholding his objection as to lack of findings makes it unnecessary for us to pass on this. In fact the two issues are interrelated; we are confident that if the judge had endeavored to frame findings, the inadequacy of the affidavits as a basis would have become apparent to him. However, there is merit to the position that if a party is unwilling to have the issuance of a temporary injunction decided on affidavits, he must make his objection known; he may not gamble on the judge's accepting his affidavits rather than his adversary's and then seek a reversal if the result is disappointing.