SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

KELLER INDUSTRIES, INC., et al.,
Defendants.

No. 71 Civ. 143.

United States District Court,
S. D. New York.

April 27, 1972.

Kevin Thomas Duffy, Regional Administrator, New York City, for plaintiff by John F. X. Peloso, Irwin M. Borowski, Michael D. Donahue, George W. Brandt, Jr., New York City, of counsel.

Mudge, Rose, Guthrie & Alexander, New York City, Feibelman, Friedman, Britton & Stettin, Miami, Fla., for defendants by Joseph C. Daley, New York City, Carmen Accordino, Miami, Fla., of counsel.

GURFEIN, District Judge.

This is an action in which the Securities and Exchange Commission (SEC) has charged that Keller Industries, Inc. (Industries), its President Henry A. Keller (Keller), and its chief financial officer Norman C. Edelcup (Edelcup) knowingly disseminated false and misleading interim financial statements in violation of the Securities Exchange Act of 1934 and the Securities Act of 1933. The SEC now moves for a preliminary injunction against the defendants enjoining them "from further violations of the Securities Exchange Act of 1934," and for other and further relief.

The motion is supported by an affidavit of Morris Lafferman, a senior staff accountant of the SEC, and is accompanied by exhibits. The defendants have countered with extensive affidavits and exhibits, and the SEC has tendered reply affidavits. The SEC has also supplied voluminous "investigation files," consisting of interviews with various people, including the individual defendants. Issues of fact arise from the affidavits and interviews as we shall see.

The investigation covered the period from November 1969 to June 1970. The complaint was not filed until January 1971. This motion for a preliminary injunction was not filed until July 28, 1971, and was adjourned to October 19, 1971. No application for a temporary restraining order was made.

The complaint is in five counts and seeks an order enjoining the defendants from violating Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, from issuing and filing false and misleading registration statements that may be required to be filed under Section 6(a) of the Securities Act, and from issuing false and misleading annual, semiannual and other periodic reports and proxy statements required to be filed under Sections 13, 14 and 15 of the Exchange Act. The motion for the preliminary injunction relates to the Exchange Act, however, and not specifically to the Securities Act.

The complaint charges that certain quarterly and semiannual reports including interim earnings figures of Industries, whose stock was registered and listed on the New York Stock Exchange, were false and misleading and affected transactions in the stock. Though the complaint alleges violations not only of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, but also of Section 13(a) & (b) of the Exchange Act and Rule 13a–13 thereunder as well as of Section 17(a) of the Securities Act, I find that the strongest allegations relate to the 10b–5 charge which concerns the first quarter report of fiscal year

1969. For reasons that will appear, there is no need to consider the relatively weaker charges made by the SEC, at this time.[1]

Industries is a Florida corporation with principal offices in Miami. Keller is, and for almost 21 years with one interruption has been, its President and Board Chairman. Edelcup is and has been a financial officer of Industries since August 1968.

The company manufactures and distributes a number of products made from aluminum, and fabric for the building industry and for consumers, such as lawn furniture, windows, rugs, ladders and the like. It has approximately one hundred subsidiaries, of which thirty are manufacturing subsidiaries and seventy are sales warehouses. The business of certain subsidiaries is seasonal to some degree, with one-third of sales occurring in the first half of the fiscal year and two-thirds in the second half.

The fiscal year begins in August and ends in July. Each of its hundred subsidiaries depends completely upon the Miami office for all its accounting services and sends to Miami virtually all its business records. The company has for some years published and distributed to its shareholders, to the Dow Jones Service and to the New York Stock Exchange unaudited quarterly reports of earnings which are consolidated statements purporting to reflect on a consolidated basis the earnings of all the hundred subsidiaries.[2]

Industries, on about December 16, 1968, mailed to its shareholders, to the New York Stock Exchange and to others its first quarter report of fiscal 1969 for the three months ending October 31, 1968. This report contained a "Consolidated Comparative Statement of Income" for the quarter. The reported net income was $1,378,000 or $.82 per share, compared to $1,164,000 or $.71 per share for the same period in the prior year. The SEC contends that income was arbitrarily increased for the quarterly period by an adjustment of $2,209,369, compared to a similar adjustment of $894,410 for the same period of the prior year.[3] The adjustment was defended as principally a deferral of current expenses to future periods of the same fiscal year in order to reflect more accurately the true earnings of the interim period.

There is no dispute that if the actual revenues and expenses for the quarter are considered in isolation, the amount attributable to the adjustment is the figure of $2,209,369. It is also not in dispute that the adjustment was made by journal entry. And although both sides agree that it was Keller who determined the journal entry in question, the parties disagree from this point on.

The SEC argues that the adjustment, which had the effect of substantially increasing earnings for the quarterly period, was made without adequate support and was not based upon sound accounting principles. The defendants, on the other hand, argue that an adjustment was necessary, in view of the seasonal character of the sales of several subsidiaries, to avoid distortion of the true earnings for the period. They contend further that this type of adjustment—the deferral of part of the expenses to a lat-

1. The complaint also charges the defendants with violations of 10b–5 through issuance of reports for the second quarter of fiscal 1969 and for the first, second and third quarters of fiscal 1967 and 1968. Additionally, the SEC alleges that the semi-annual earnings reports submitted after the second quarter of fiscal years 1967, 1968 and 1969 to the SEC on its form 9–K constituted violations of Sections 13(a) & (b) of the Exchange Act and Rule 13a–13. Finally, it is charged that the semi-annual earnings for fiscal years 1967 and 1968 appearing in Industries' registration statement filed with the SEC on January 29, 1968 violated Rule 10b–5 as well as Section 17(a) of the Securities Act.

2. There are approximately 2300 holders of record of its common stock.

3. Reported net income before federal income tax for the first quarter of fiscal 1969 was $2,282,000.

er period when sales will be greater— should not be based on rigid formulae, but rather on the judgment of the principal operating officer, Keller, who had been at the helm for twenty years and was best able to exercise a value judgment.[4]

■ The accountants involved have furnished conflicting affidavits. The SEC accountants point to the fact that there are no worksheets to support the disputed adjustment and that proper accounting methods require an objective approach based on books and records which can serve as the basis for a consistent accounting method. The accountants for the company, while not in disagreement, stress the argument that the accounting profession, while recognizing the validity and, indeed, the necessity for deferrals in seasonal businesses, has never formulated governing rules for the deferral technique as far as interim reports are concerned.[5] The emphasis, in their view, is properly on business judgment rather than on purely objective criteria.

The SEC points to several facts as indicating that Keller was reckless. First, it argues that by his method he could control quarterly earnings as he wished with no measurable yardstick. Second, that his admitted method of deferring operating losses of his subsidiaries rather than using an actual allocation of expenses to revenues creates a fictitious earnings figure. Third, that Keller, by his own concession, included not only seasonally affected subsidiaries, but others with no seasonal problems at all, in his adjustments. Fourth, that Keller admitted that he had eliminated a

$305,000 loss of one subsidiary in the first quarter, possibly the result of theft, from the first quarter figure because he "hoped" that the loss would be made up later in the year. Last, that the quarterly report failed to show either footnote or other explanation of the fact that there was a tremendous adjustment in earnings because of this alleged deferral of expenses.

The SEC investigation was apparently triggered by two events which occurred at about the time of the issuance of the quarterly statement in question, and which resulted in complaints. First, there was a private placement of 5% subordinated convertible notes of Industries in the amount of $10,000,000. This placement was closed on December 5, 1968, but there is no evidence that the quarterly report published on December 16, 1968 was shown to the note purchasers before the closing.[6]

Second, on March 17, 1969, Keller and his family sold 830,083 shares of Industries to Giffen Industries (Giffen) for $60 per share. In addition to a complete purchase contract, there was also a "memorandum of understanding" in that transaction. It recited, in pertinent part, that Giffen acknowledged being advised that the results of Industries' operations for the second quarter of fiscal 1969 might reflect less earned income and operating profit than in the same period of the preceding fiscal year and that "Keller [Industries] has, in the past, and is now following an accounting practice whereby it defers certain of its costs of operation during the first two quarters of each fiscal year to be charged during the last two quarters of

4. The adjustment in the quarterly reports had no effect on the annual operating statements, which were based on year-end results.

5. There can be no doubt that an interim quarterly report circulated to the public can be actionable, if it is materially misleading. Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 843 (2 Cir.), cert. denied, 344 U.S. 856, 73 S.Ct. 89, 97 L.Ed. 664 (1952). Being interim rather

than annual does not insulate a report from complaint. See Securities Exchange Act Release No. 9559, CCH Fed.Sec.L. Rep. ¶ 78,692 (April 5, 1972).

6. However, the making of various complaints by the noteholders, including a claim that earnings figures were false and misleading, eventually resulted in a revision of the Note Agreement by which the amount and dates of certain prepayments were altered in their favor.

each fiscal year . . . ." Surprisingly, the lawyers for Giffen did not ask for the adjustment figures or how they were arrived at. They nevertheless requested rescission when after the take-over the first two quarterly reports of fiscal 1969 appeared to be inflated. After the commencement of a lawsuit by Giffen, partial rescission was agreed upon. The suit was settled by retention of the sixty dollar per share price for the shares that had already been paid for, but also by the Keller family accepting back the shares not yet paid for—about 600,000 shares—thus putting Keller back in office and in control. The SEC infers that the settlement was made because Keller was hooked on his own misleading quarterly reports. Keller responds that he settled the lawsuit because he was afraid that Giffen would be financially unable to pay him the balance of the purchase price of about 35 million dollars.

Be that as it may, the controversy between Giffen and Keller brought to the surface the first quarterly report of fiscal 1969, and the second quarterly report which relied on the first. Haskins & Sells were asked by Giffen to determine the basis for the adjustment of $2,209,-369 in the first quarter report. They could find no worksheets or book entries to support the adjusting journal entry. They gave it as their opinion that the "adjustment" was unjustified. They recognized that deferrals of certain expenses were proper in a seasonal business if correctly computed. They advised that the earnings for the first two quarters of fiscal 1969 should be restated. At the same time, April of 1969, Industries adopted a new deferral program with the concurrence of Haskins & Sells.

As a result of the restatement of earnings by the method approved by Haskins & Sells, the deferral fell from the $2,209,369 figure for the first quar-

ter of fiscal 1969 to only $570,383, resulting in a reduction in the per share earnings from $.82 to $.23. Similarly, for the second quarter the cumulative deferral decreased from $2,244,700 to $905,293, resulting in a reduction of per share earnings from $.92 to $.45. The SEC was informed of the restated earnings and of the change in the method of treating deferrals.

The 9–K form filed with the SEC for the six-month period ending January 31, 1970 bore a legend reading as follows: "Net income for the period has been reported on a basis consistent with an accounting method used by the company in past years as modified in April, 1969, which defers certain seasonal operating expenses. This modification of the past accounting method, approved by the company's independent auditors, has the effect of deferring less operating expenses to the second half of the year with a corresponding reduction of income in the first and second quarters. Amount deferred, net of provision for Federal Income Taxes was $372,512 for the six month period ended January 31, 1970.

The new form 10–Q, which superseded the semi-annual 9–K form as of December 31, 1970 and which the company must file quarterly, has a note which states that "Net Income for the periods has been reported using an accounting method which defers certain seasonal operating expenses. Amounts deferred . . . were $_____ . . . for the periods ended . . . ."

Since the new method of deferral was adopted, Industries has filed nine quarterly and semi-annual reports, none of which has been challenged by the SEC.

Returning to the issue of whether the method of deferral employed prior to April 1969 was misleading, it appears obvious that the method employed by Keller partook more of crystal-ball gazing than of proper cost accounting.[7]

---

7. The Court is well aware that accounting is not a simple or an exact science. Nevertheless, some principles are clearly and firmly established. For one thing, it is clear that deferral of expenses is sometimes not only permissible but indeed desirable in order to convey most accurately the earnings for a given period. "For

But on this application for a preliminary injunction, we must be mindful of the admonition of the Court of Appeals in SEC v. Frank, 388 F.2d 486, 492 (2 Cir. 1968): "where, as in this case, issuance of an injunction on the ground of fraud turns on the knowlege and intent of an individual during a short period of time, we perceive no basis for dispensing with the evidentiary hearing normally required simply because the plaintiff is a government agency, for whose vigorous efforts to eradicate securities abuses this court entertains the highest respect." [8] The issue of wilfulness is here sharply disputed. For example, the SEC charges that the misleading first quarter figures were designed to mislead the note purchasers, but it appears that the notes were purchased before the figures were disclosed. The SEC charges also that Keller intended to mislead Giffen, although it appears that specific reference to the deferrals was, in fact, made by Keller in the memorandum of understanding.

██ There is no longer doubt, of course, that, even if the note purchasers and Giffen were not misled, a misleading of market purchasers would, in itself, be enough to make out a 10b–5 violation.[9] See SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2 Cir. 1968), cert. denied, 394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969); Heit v. Weitzen, 402 F.2d 909 (2 Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). And it may well be that, on a trial, the SEC will succeed in showing sufficiently the intent, or even reckless negligence, that would sustain injunctive relief.[10] But on this motion, the intent of the defendants cannot be finally determined without an evidentiary hearing. Moreover, other issues in this case also deserve development in the way only a trial permits, e. g., specification of the accounting rules which would properly govern Industries' situation; determination of what role, if any, Edelcup played in those violations; and exploration of the directness of involvement of Keller in the preparation of reports other than the report for the first quarter of fiscal 1969.

At this stage, I think it would be unfair for me to attempt to formulate a sensible decree that would support a subsequent contempt order if the defendants should wilfully fail to obey.

---

the income statement to provide a meaningful picture of operations, the expense items must be included in the same period as the income items they help to produce; in other words, interrelated items of expense and income must be 'matched' in some particular period." R. Amory & C. Hardee, Materials on Accounting 89 (3rd ed. D. Herwitz & D. Trautman 1959).

On the other hand, it is just as clear that deferral cannot be a euphemism for arbitrariness, that there must be a basis in fact for the matching of expenses to income, that "the accounts and statements should give expression, as far as possible, to facts . . . supportable by objective data." R. Wixon, Accountant's Handbook § 1.14 (4th ed. 1965), quoting H. Finney & H. Miller, Principles of Accounting, Intermediate (4th ed. 1951). Even putting aside the issue of non-disclosure, it is certainly improper to use deferral techniques to manipulate earnings figures for interim financial statements. See In re Ultrasonic Corp., 37 S.E.C. 497 (1957).

8. See also SEC v. Capital Gains Research Bureau, Inc., 300 F.2d 745, 746 (2 Cir. 1962), aff'd en banc, 306 F.2d 606 (2 Cir. 1962), rev'd on other grounds, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

9. It might be incidentally noted that the market price for Industries' stock fell from about $62 in January 1969 to about $18 in September 1969.

10. It is true, as the SEC argues, that intent and wilfulness are not explicit tests which must be met to authorize an injunction sought by the SEC. See 3 L. Loss, Securities Regulation 1979 & n. 22 (2d ed. 1961); 6 id. 4115–16 (1969). Nevertheless, it is an issue that warrants exploration before a court can make the admittedly necessary determination regarding the degree of danger of recurrence and, more generally, before a court can, in its discretion, conclude that injunctive relief is warranted and then shape an appropriate remedy. See SEC v. Frank, supra.

Cf. SEC v. Great American Industries, Inc., 407 F.2d 453, 481 (2 Cir. 1968) (Moore, J., dissenting), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969). Unless the proper accounting method for deferrals is spelled out, which this Court is unprepared to do, the SEC is better served by proceeding anew against the defendants if they should fail to heed the warning implicit in this opinion.

■■■■ The SEC concedes that it has "the burden to present a strong prima facie case of violation." It may well have done so, but that is not enough. There must also be a showing that there exists a "reasonable expectation of further violations" of the securities laws. SEC v. Culpepper, 270 F.2d 241, 250 (2 Cir. 1959). And I am not convinced that there is such a "reasonable expectation." Even though the defendants are now contending, as one point in their defense to this lawsuit, that they did nothing wrong, their actions speak louder than their words. They have, in fact, adopted a new method of determining the amount of deferrals, and have followed it since April 1969. That is significant. See SEC v. Computronic Industries Corp., 294 F.Supp. 1136 (N.D. Tex.1968). Although the court's power to grant injunctive relief survives discontinuance of the illegal conduct, United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953), power should not be equated with discretion. As the Supreme Court said: "the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive" (*id.*). My refusal to grant a preliminary injunction now should not be taken as an indication, however, that the old method was an acceptable method. Enough has been said here to convince the defendants and others similarly situated that they would retrogress only at their peril.

■■ But even assuming *arguendo* that there is a "cognizable danger of recurrent violation," that condition does not alone suffice to authorize an injunction. We must still weigh those principles of fairness and justice that have always been the concern of equity courts. Hecht Co. v. Bowles, 321 U.S. 321, 328–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944). The adverse effect of an injunction upon the defendants is also a factor to be considered. See SEC v. Harwyn Industries Corp., 326 F.Supp. 943 (S.D.N.Y.1971). This is a public company, and its stockholders, the prospective beneficiaries of any relief, would be harmed by an injunction now. Nor is there urgent need for the relief sought, as shown by the fact that the SEC did not seek a temporary restraining order, brought the action six months after its own hearings had been terminated, and filed this motion six months thereafter.

In the view of this Court, moreover, there is no urgency that would require "the trial of the action on the merits to be . . . consolidated with the hearing of the application" for a preliminary injunction. Fed.R.Civ.P. 65(a) (2).

The foregoing shall constitute the findings of fact and conclusions of law in compliance with Fed.R.Civ.P. 52(a).

On a balance of need and in the exercise of discretion, the application for a preliminary injunction is denied.

It is so ordered.