SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

PETROFUNDS, INC., et al., Defendants.

No. 76 Civ. 2368.

United States District Court, S. D. New York.

June 22, 1976.

Irwin M. Borowski, Associate Director, David H. Belkin, Sp. Counsel, Robert E. Grossman, Andrew Leventhal, Securities and Exchange Commission, Washington, D.C., William D. Moran, Regional Administrator, New York Regional Office, Securities and Exchange Commission, New York City, for plaintiff.

Webster & Sheffield, New York City, for defendants McRae Consolidated Oil & Gas, Inc., McRae Oil Corp., Petrofunds, Inc., James A. McRae, David L. Kelley, J., Frank Benson; Harvey D. Myerson, Bruce Top-

man, Kurt V. Blankmeyer, William Moorhead, New York City, of counsel.

Hargrove, Guyton, Ramey & Barlow, Shreveport, La., for defendants Louisiana Gas Purchasing Corp. and Louisiana Gas Intrastate, Inc. of Shreveport; Ray A. Barlow, Thomas J. Wyatt, Shreveport, La., of counsel.

Diamond & Johnson, Houston, Tex., for defendants Sunny South Oil and Gas, Inc. and Edward C. Dorroh; J. W. Johnson, Houston, Tex., of counsel.

Lankenau, Kovner & Bickford, New York City, for defendant Osias Biller; Nathaniel J. Bickford, New York City, of counsel.

## OPINION

### EDWARD WEINFELD, District Judge.

This motion for a preliminary injunction and the appointment of a temporary receiver is the opening sally in what is already a vigorously contested lawsuit. Plaintiff, the Securities and Exchange Commission ("Commission") has brought this action alleging fraud in connection with the sale of interests in oil and gas drilling programs to public investors. It moves for a preliminary injunction enjoining some but not all defendants[1] from continuing to commit acts allegedly in violation of the securities acts of 1933 and 1934, disposing of or exercising any control over the assets of the corporate defendants or the drilling programs, issuing any new securities, declaring any dividend or distributing any assets of the corporate defendants, and altering the structure of the corporate defendants or the drilling programs. In addition, the Commission requests the court to appoint a temporary receiver for Petrofunds, Inc. ("Petrofunds"), McRae Oil Corp. ("McRae Oil"), McRae Consolidated Oil and Gas, Inc. ("Consolidated"), Louisiana Gas Purchasing Corp. ("LGP"), Louisiana Gas Intrastate, Inc. of Shreveport ("LGI"), Sunny South Oil and Gas, Inc. ("SSOG") and the drilling programs, who would take custody of the books, records and assets of these entities, conserve and manage them, seek an accounting, and report to the court on "the true state of affairs of the Petrofunds oil and gas drilling programs."

The alleged unlawful and fraudulent acts upon which the motion is founded are said to have been committed between 1968 and 1973. Within that period and thereafter Petrofunds raised approximately $80,000,-000 through public sales of participating interests in oil and gas drilling programs. The sales followed the filing of Petrofunds' registration statements with the Commission and the issuance of prospectuses with respect to various drilling programs. The public investors under these programs acquired either a joint venture or limited partnership interest in the drilling programs to which they subscribed. Petrofunds arranged for the acquisition, testing, development and operation of oil and gas leaseholds; in effect it was the agent of the participants in the joint ventures and the general partner of the limited partnerships.

The last effective date of a Petrofunds' registration statement for the public sale of interests in a gas or oil drilling operation was April 13, 1973, and the last sale of securities thereunder was made in November 1973.[2]

The instant motion by the Commission is made more than two years after it commenced in March 1974 and thereafter continued an investigation into the affairs of Petrofunds. Since the onset of the investigation Petrofunds has not publicly offered any new drilling programs.

Defendant James McRae is a principal of and the moving force behind Petrofunds.

1. The complaint names 21 defendants, but the Commission seeks preliminary relief against only Petrofunds, Inc., McRae Oil Corp., McRae Consolidated Oil and Gas, Inc., Louisiana Gas Purchasing Corp., Louisiana Gas Intrastate, Inc. of Shreveport, Sunny South Oil and Gas, Inc., James A. McRae, David Kelley, J. Frank Benson, Osias Biller, and Edward C. Dorroh.

2. A subsequent registration statement Petrofunds filed with the Commission for its 1974 drilling program has not been declared effective. Petrofunds has continued to solicit money by making "voluntary development calls," however. These are discussed *infra* at p. 1197.

Kelley and Benson are two of its officers and directors. Other defendants include various corporations allegedly under the direct or indirect control of McRae, including some which allegedly were used to siphon off profits and interests of gas drilling operations which properly belonged to the public investors. Also named as a defendant on the motion is Osias Biller, a lawyer and accountant, who allegedly acted in concert with McRae and other individual defendants and received interests in drilling operations at the expense of the public investors.

The charges of fraudulent conduct center in the main about three items: (1) the acquisition of drilling prospects through so-called "interpositioned companies" and the consequent skimming off of interests, profits and commissions; (2) the diversion of assets by the use of investors' money to promote the programs and for personal expenses such as apartments, vacations and clothing; and (3) a sale of natural gas production to the Louisiana Power & Light Company ("LPL") and the construction of a pipeline by it for the benefit of certain defendants.[3] As set forth below, in each instance the defendants have countered the Commission's charges and presented evidence raising sharp factual issues.

### A.   The Acquisition of Prospects

At the heart of the Commission's case is its charge that "the defendants controlled a vast amount of acreage and established a number of interpositioned shell companies into which this acreage, in the form of oil and gas prospects, was 'parked' for eventual sale to public drilling programs which Petrofunds promoted." Essentially the claim is that Petrofunds, instead of using the proceeds of its public sales of interests to acquire acreage or leaseholds to explore for

gas and oil, used the interpositioned companies controlled by McRae and his associates for that purpose, and thereafter these companies entered into projects with Petrofunds. Allegedly the net effect was that the interpositioned companies skimmed off profits that properly belonged to Petrofunds to the extent that they marked up costs and received commissions and undivided interests without performing legitimate services.

To support its charges, the Commission has introduced evidence showing Matlock Oil Co., Fannin Oil Co., E–K Oil Co., Sunny South Oil and Gas, Inc., and others—all alleged to be interpositioned companies controlled by McRae—purchased various prospects from third parties and later resold the prospects to Petrofunds at a higher price or after subtracting commissions or undivided interests. The Commission has also tendered affidavits and testimony of witnesses who appeared before it during its private investigation. These, the Commission contends, show that McRae directed the formation and operation of the interpositioned entities and instructed leasehold owners to bring the deals to those entities and not to Petrofunds in the first instance.

Apart from pointing to deficiencies in the quality of the Commission's proof,[4] McRae has submitted an affidavit specifically denying any participation in the formation or control of the alleged interpositioned companies, which are only several of more than fifty companies from which Petrofunds acquired interests in leasehold properties. Moreover, other affidavits in the record, as well as testimony taken before the SEC, support his claim that companies such as Matlock Oil, E–K Oil and SSOG were independently operated and formed for legitimate business reasons having nothing to do

---

**3.** The parties have made other charges and denials, but they have devoted most of their attention to those here discussed.

**4.** SEC Exhibit 17 at 115–16, for instance, consists solely of hearsay and responses to questions of a staff lawyer as to the "word out in the street" concerning Petrofunds' willingness to accept direct deals. Similarly, SEC Exhibit

10 at 5, 113, relied upon to show that defendant Dorroh operated E–K Oil for McRae's benefit, does not on its face support the contention. Page 5 was inadvertently omitted, and page 113, so far as the partial answer there given reveals, merely explains how a lease broker operates.

with McRae. There are also specific denials that these companies acquired prospects at McRae's direction.

The disputed fact issues that pervade this recital also extend to other aspects of the alleged improper use of interpositioned companies. Thus, without dealing with each allegation in detail, the Commission's charges concerning the consolidation of the various interpositioned entities to form SSOG, and alleged overpayments to SSOG in the guise of compensation for SSOG's acceptance of turnkey drilling obligations [5] are countered by McRae's and Dorroh's sworn statements that McRae did not control SSOG and that Petrofunds' dealings with SSOG were fair and favorable to the programs. Indeed, it is their submission that the turnkey agreements protected Petrofunds' investors against unlimited and skyrocketing drilling costs. In 1972, they assert, SSOG refused to turnkey any wells for Petrofunds because of large losses on earlier contracts. The defendants contend that it was the risk of this loss assumed by SSOG that justified the compensation paid to it as the turnkey operator.

The Commission's charge that McRae used the interpositioned companies to launder moneys siphoned off from public investors is resisted not only by McRae's denial of control over the companies but by his claim that payments to him from defendant Roberts, an attorney, were loans "made in purely conventional fashion, without use or means of any other company or individual." The Commission's exhibits, tendered without adequate explanation or supporting testimony, do not at this juncture compel an opposite conclusion.

Finally, on this aspect of the case, there are irreconcilable conflicts concerning defendant Biller's role in the acquisition of prospects by the drilling funds. The Commission charges that Biller, an attorney and a CPA, acted as a selling agent for the Petrofunds programs and placed many of his clients in them. For this he allegedly received certain "carried interests" in prospects acquired by the interpositioned companies. In addition, the Commission contends that over one million dollars paid to Biller by Petrofunds and carried on its books for professional services rendered by him were unreasonably large, and that the excess over the fair and reasonable compensation for his services in fact represents commissions for his efforts in selling Petrofunds securities to his clients and others. Biller categorically denies the assorted charges levelled against him. He has presented over four million dollars in cancelled checks (which were made available to the Commission during the course of its investigation) which he states represent his purchases of various interests in Petrofunds projects, and negates the Commission's charge that he acquired such interests as compensation for promotional or related activities. Further, he avers that he purchased his interests not from Petrofunds but from the previous owners of the prospects, who offered opportunities to him for their own best interests and to gain additional funds. He contends that he was "carried" only to the extent of being relieved of his pro rata share of the costs of drilling the first well on a prospect to its casing point (the point at which it was determined whether or not to complete the well), and that thereafter he bore the full cost of completing the first well and of drilling subsequent wells. This arrangement, he claims, was favorable to the previous owners because it provided them with the funds necessary to complete the drilling on the prospects, which they otherwise would have been unable to do. Finally, he denies he made any sales as alleged and describes the services he performed for Petrofunds that he contends in light of his experience and expertise justified the payments previously made to him. These payments for professional fees have been made to him annually in the same substantial sums since November 1973, when the last sale of Petrofunds securities occurred.

5. In a turnkey contract an operator agrees with the owner of the working interest in a prospect to drill a specified well to a specified level for a specified return.

## B. *Diversion of Assets*

The gravamen of the Commission's charge on this score is that McRae and his associates charged the drilling programs with many expenses, including personal expenses and expenses of offering and selling interests in the programs, that were improper. To sustain this charge the Commission relies upon entries in Petrofunds' books for air travel abroad, clothing, hotel accommodations, apartments in Boston, New York and Acapulco, and other items. McRae, however, contends that all of these charges were reasonably related to the operation and promotion of the drilling funds. He cites the trip to Europe, for example, as an effort to meet persons who could perform drilling for the programs or who owned oil and gas interests for potential acquisition. A claim that McRae's relatives and friends were placed on corporate payrolls, upon questioning of plaintiff's counsel, appeared to be without significant factual support.

## C. *The Pipeline Transaction*

In this aspect of the case the Commission alleges that Petrofunds discovered substantial gas reserves on its holdings in 1971, whereupon McRae, Biller and others hatched a scheme to divert potential profits to themselves. Thus the Commission has tendered exhibits that establish that McRae Oil, Biller, Franks, and SSOG formed defendant Louisiana Gas Purchasing Corp. ("LGP") in August 1971 and entered into contracts with that company whereby all of their gas reserves, including those held by Petrofunds, were sold to LGP for 30–35 cents per MCF (thousand cubic feet) for the life of their production. LGP, in turn, contracted with Louisiana Power & Light Co. ("LPL"), a public utility, for the sale of production from the reserves to LPL for 48 cents per MCF, for the next fifteen years. The Commission concludes that the 18-cent differential between LGP's purchase price from Petrofunds and the others and LGP's sale price—which allegedly could amount to $40,000,000 over the life of the contracts—represents a skim-off of profits from the public programs to the defendants. Also, the exhibits establish that McRae, Franks, Biller and SSOG made the sale of the gas to LPL contingent upon LPL's building a pipeline to transport the gas and leasing the pipeline to LGP. LGP now leases the pipeline with the right to buy it for a nominal sum after fifteen years. The Commission contends that the public drilling programs, whose reserves at least in part induced LPL to build the pipeline, should have been offered an interest in the profits of its operation. McRae asserts, among other matters, that the construction of an intrastate pipeline was essential to obtaining a good price for the gas owned by the programs, and that the 30 cents per MCF paid to Petrofunds was an excellent and indeed an unheard of price at the time. It is his contention, which appears to find support in the record, that without the use of the pipeline the price would have been limited to 18.75 cents per MCF, as set by the Federal Power Commission for interstate sales. The 48-cent price payable to LGP upon delivery of the gas to LPL, with its built-in 18-cent spread, he says, was calculated by accountants as necessary to cover the amortization, rent, operation and maintenance of the pipeline, and would not result in a profit absent the discovery of additional gas reserves. McRae avers that LGP in fact has not profited on the gas purchased and delivered from the wells drilled at the time of the original contract with LPL. Moreover, he states that public investors could not have participated in the pipeline venture because this would have been outside the scope of their subscription agreements. A new offering with its necessary delay would have entailed considerable risk of forfeiture of mineral leases since Louisiana law required their prompt exploitation. Also, LPL, the public utility, insisted on dealing with a single entity that would guarantee production and costs of the pipeline construction; he contends that such an open-ended risk arrangement would have been unattractive to individual investors.

Even this brief distillation of the welter of affidavits and testimony illustrates that the record on this motion fairly bristles

with disputed fact issues. This court's reading of the testimony and hundreds of exhibits relied upon to permit the claimed inferences of wrongful conduct in instance after instance indicates that the alleged fact upon which the inference is sought to be based is not clearly established or articulated, even apart from the denial by particular defendants of the verity of the testimony against them. The fact that the Commission has compiled a massive record of testimony and exhibits over its twenty-five month investigation does not relieve it of the burden of establishing its claims. While the Commission challenges the defendants' sworn denials of the charges against them, the Court of Appeals has repeatedly admonished district judges passing on motions for preliminary relief "not [to] resolve a factual dispute on affidavits or depositions for then [they are] merely showing a preference for 'one piece of paper to another.'"[6] Since the Commission has chosen to rest on its papers,[7] the court has no basis on which to decide, even tentatively, which parties' version of events is accurate or truthful. Upon the record, as presently constituted, a violation of the federal securities laws "has [not] been so clearly established that defendants are, in effect, to be found at fault without awaiting the development of all the facts upon a trial."[8] In short, the Commission has thus far failed to establish its "requisite 'strong prima facie case'" of violation.[9]

Even were this showing not required where inquiry must be had into hundreds of complex transactions spread out over many years, and where "'the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation,'"[10] there has been no showing that the balance of hardship tips in favor of plaintiff. Almost a year ago, following an investigation that lasted at least fifteen months, plaintiff's staff recommended bringing an enforcement proceeding to the Commission proper; permission to proceed was granted in late March or early April 1976. In the period between the commencement of the investigation of Petrofunds in 1974 up to the filing of this suit in late May 1976, Petrofunds and the other companies named as defendants continued to function. The Commission during that entire period did not attempt in any way to enjoin them or restrict their activities. Then, after this time lag of well over two years, the Commission suddenly moved, on the eve of the Memorial Day weekend and on ninety minutes notice, for a temporary restraining order, a preliminary injunction and the appointment of a receiver pending the final hearing and determination of this action. A receiver is sought not only for Petrofunds, but for affiliated companies, including two companies that supply gas to public utilities in Louisiana. In effect, the receiver would take these companies over lock, stock and barrel. If, as the Commission contends, the defendants have up to this day engaged in a continuing course of conduct which defrauds the investing public and despoils them of their rights under the

---

6. *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 540 (2d Cir. 1973), *quoting Dopp v. Franklin Nat'l Bank,* 461 F.2d 873, 879 (2d Cir. 1972), *quoting Sims v. Greene,* 161 F.2d 87, 88 (3d Cir. 1947).

7. The court offered an evidentiary hearing, but Commission counsel was of the view that the record was sufficient for a disposition. In any event, an evidentiary hearing in advance of trial would be impracticable in light of "the magnitude of inquiry" and "the breadth of the issue[s] having to be explored." *SEC v. Frank,* 388 F.2d 486, 490, 491 (2d Cir. 1968) (Friendly, J.). *See also SEC v. Vesco,* 358 F.Supp. 1186, 1189 (S.D.N.Y.1973).

8. *SEC v. Capital Gains Research Bur.,* 306 F.2d 606, 608 (2d Cir. 1962) (en banc), *rev'd on other grounds,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). *Accord, SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 n. 1 (2d Cir. 1975).

9. *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975), *quoting SEC v. Boren,* 283 F.2d 312, 313 (2d Cir. 1960). *See also SEC v. Keller Indus., Inc.,* 342 F.Supp. 654, 660 (S.D.N.Y.1972).

10. *SEC v. Frank,* 388 F.2d 486, 491 (2d Cir. 1968), *quoting Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953).

drilling programs, it is indeed difficult to understand why no action was taken to prevent such wrongful conduct during the last twenty-five months and why suddenly it becomes imperative overnight to appoint a receiver.[11] There is no adequate explanation for this foot-dragging if in fact immediate action was required.

Of additional significance on the need for immediate relief is the fact that the alleged fraudulent behavior, in the main, occurred no later than 1973. To be sure, any fraud, perpetrated between 1968 and 1973 continues to have an impact on the diversion of profits from current gas production, but the status quo is not jeopardized to the extent that it would be were the defendants now engaged in active wrongdoing or liquidation of their assets. Also, it appears Petrofunds has not offered or sold new interests in drilling programs to the public since November 30, 1973, the closing date of its last offering. While it has not similarly refrained from issuing "voluntary development calls," [12] such calls are apparently necessary to preserve present interests owned by the drilling funds, and the Commission does not on this motion seek to enjoin future calls provided they are accompanied by full and adequate disclosure.[13]

The absence of need for an immediate injunction is underscored by an action commenced in August 1975 in the Southern District of Texas by two investors suing on behalf of themselves and others similarly situated. The suit seeks an accounting, damages, disgorgement of the stock of the pipeline companies and their profits and rescission of the fifteen-year gas supply contract with Louisiana Power & Light Co. The complaint makes many of the same allegations as appear in the Commission's complaint, and names many of the same defendants. The Texas plaintiffs, however, did not deem it necessary in the protection of their or their class interests to request preliminary injunctive relief or the appointment of a receiver pending the outcome of the litigation.[14]

Also of some moment is the attitude of a substantial proportion of Petrofunds investors, whose investments total approximately $29,000,000, with individual investments as high as $4,800,000. This group encompasses investment advisers, experienced and sophisticated businessmen, lawyers, accountants, professionals, and a nationally recognized law professor whose articles and views are frequently cited by the Supreme Court of the United States and other courts. Many of them, beginning in October and November 1975, addressed individual letters to the Commission, which in substance referred to the fact that the Commission's investigation at that time had gone on for eighteen months, protested the Commission's delay and affirmatively praised the Petrofunds program and the

11. *Cf. SEC v. Keller Indus., Inc.*, 342 F.Supp. 654, 660 (S.D.N.Y.1972).

12. These are requests addressed to original investors to put up additional moneys for further development of previously acquired acreage or the acquisition and development of areas offsetting initial exploratory drilling. The investors need not respond to the call, but if they fail to do so their interests in proceeds are limited to that portion of the program's profits allocable to the initial drilling. Since the development drilling is done only in areas previously determined to be promising or productive, the return on the money put up for development is relatively high. Indeed, the opportunity to invest in development drilling is supposedly the most desirable part of every oil and gas investment.

13. The court expresses no view at this time concerning what disclosure would be appropriate if Petrofunds persists in making development calls.

The Commission contends that each development call requires a new registration, which the defendants dispute. However, the Commission does not press this contention on the current application for relief. "Full and adequate disclosure," according to the Commission, would require Petrofunds to acknowledge the verity of plaintiff's charge.

14. Three other investors brought a suit in October 1974, also in the Southern District of Texas, alleging misrepresentations in connection with the purchase of their interests in the 1970 drilling program. They sue only on their own behalf. They join in the Commission's request for a receiver, except to the extent that this would preclude them from prosecuting their claims.

opportunity it afforded for sound investment. They decried the fact that the investigation had interfered with Petrofunds' ability to raise additional capital for further exploration and development of gas resources and had deprived them of the opportunity for further investment. One letter, typical of most, addressed to the Commission on November 4, 1975, by an investor, stated:

"I understand that you are conducting a fact-finding inquiry of Petrofunds, Inc. and that this investigation has been going on for some time. I am an investor with Petrofunds and you may be interested in my opinion of the company and its operations.

. . . . .

"The results to date indicate that my investment has been a good one. I am quite satisfied with the results obtained by Petrofunds for my account.

"I am concerned over the fail-out from your fact-finding inquiry. The failure to bring it to a head produces much uncertainty. Without prompt resolution the party investigated and the investors are hurt. Certainly we as investors are not protected by a proceeding which is not brought to a speedy conclusion.

"I hope that you can conclude your inquiry of Petrofunds' operations as soon as possible so that I may have the opportunity to make additional investments with Petrofunds in the future if I so desire."

To be sure, the views of these writers, reflecting their own personal interests in terms of advantageous tax shelters, would not influence the court if plaintiff had adequately established its claim to preliminary relief. However, they emphasize that the Commission's long delay in applying for such relief raises serious doubts that in fact it is required at this time. Moreover, the letters and the other evidence submitted on this motion reveal that this is not a typical fraud case involving a "fly-by-night" issuer

and the sale of worthless securities resulting in investors' ruination. The entities involved are substantial concerns engaged in ongoing operations. Whether or not the Petrofunds investors should have received more than they did, as the Commission contends, many of them appear to be satisfied with their return. Such sentiments may be irrelevant to the merits of the underlying charges, but they do bear on the need for immediate and drastic relief.

Finally, the court takes note of the potential harmful impact of a receiver and an injunction on the legitimate activities of the defendants.[15] Indeed, for a receiver to take over the assets of defendants Louisiana Gas Purchasing Corporation and Louisiana Gas Intrastate, Inc., both of which supply gas to various industries, public utilities and municipalities in Louisiana, would disrupt their operations and instead of preserving the assets allegedly belonging to public investors could be disastrous to them—this, entirely apart from the potential adverse effect upon the gas-consuming public in Louisiana.

It may well be that upon a trial, where the disputed fact issues are fully explored and the court afforded an opportunity to appraise the demeanor of witnesses and to evaluate their credibility in making its fact determination, plaintiff may fully and abundantly establish its various claims so as to entitle it to the full relief it seeks. Upon the present record, however, it has failed to carry its burden of proof as to its various charges so as to warrant the drastic remedy of a preliminary injunction in advance of trial.

Upon all the circumstances discussed above, the motion for preliminary injunctive relief and the appointment of a receiver is denied.

---

**15.** *Cf. SEC v. Brigadoon Scotch Distrib.*, 388 F.Supp. 1288, 1293 (S.D.N.Y.1975); *SEC v. Keller Indus., Inc.*, 342 F.Supp. 654, 660 (S.D.N.Y.

1972); *SEC v. Harwyn Indus. Corp.*, 326 F.Supp. 943, 957–58 (S.D.N.Y.1971).