**SMI INDUSTRIES CANADA LTD., Plaintiff,**

v.

**CAELTER INDUSTRIES, INC., Defendant and Counterclaim Plaintiff,**

v.

**SMI INDUSTRIES CANADA, LTD. and S.M.I. Industries U.S.A., Inc., Counterclaim Defendants.**

**No. 83–CV–1515.**

United States District Court, N.D. New York.

May 21, 1984.

810

Hiscock, Lee, Rogers, Henley & Barclay, Syracuse, N.Y., for plaintiff and counterclaim defendants; J. Eric Charlton, Syracuse, N.Y., of counsel.

Mackenzie, Smith, Lewis, Michell & Hughes, Syracuse, N.Y., Limbach, Limbach & Sutton, San Francisco, Cal., for defendant and counterclaim plaintiff; Dennis P. Hennigan, Syracuse, N.Y., George C. Limbach, Marie S. Cefalu, San Francisco, Cal., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

This is an action for trademark and patent infringement as well as unfair competition. Plaintiff, a Canadian corporation, is engaged in the manufacture, sale and distribution of commercial snow removal and airport rescue equipment. Defendant, a New York corporation, is engaged in the same industry. At issue in the instant lawsuit are the trademarks "SMI," "Snowmaster" and "Firemaster," all names used on various products manufactured by the parties herein. The patent at issue, U.S. Patent No. 4,178,007, concerns what the parties commonly refer to as a "Hydraulic Anti-Shimmy Device for Caster Wheels." This device is apparently used to aid in removal of snow with large snow removal vehicles. Lastly, the unfair competition claim concerns defendant's alleged defamation of plaintiff and its products. Defendant has answered plaintiff's complaint and has counterclaimed for both federal and state statutory unfair competition.

Presently before the court are plaintiff's motions for an order disqualifying the law firm of Limbach, Limbach & Sutton from representing the defendant Caelter Indus-

tries, Inc., and for a preliminary injunction pending a trial on the merits. *See* Fed.R. Civ.P. 65. Before addressing the motions the court believes that the complex factual background of this case must be set forth in some detail.

## I. FACTS

Caelter Enterprises, Ltd., a now bankrupt Canadian corporation, was the owner of the intellectual property at issue in this lawsuit. Prior to May of 1977 Caelter Enterprises licensed these properties to its wholly owned subsidiary Caelter Industries, Inc. for use in the latter's Watertown, New York business, operating under the name of SMI New York. In May of 1977 when Caelter Enterprises was encountering severe financial difficulties, Caelter Enterprises President Walter O. Lampl entered into an agreement known as a Trust Deed with the Royal Trust Company of Montreal. The purpose of this agreement was to secure the bond obligations of Caelter Enterprises with the Royal Trust Company acting as a trustee for the bondholders. As collateral for the Trust Deed, Caelter Enterprises gave the Royal Trust Company the equivalent of a security interest in its intellectual property and other assets, including most, if not all, of the patents and trademarks at issue herein.

Caelter Enterprises continued with its financial difficulties until the company finally went bankrupt in December of 1982. At that time the Royal Trust Company and Bank of Montreal, a bondholder, assumed possession and control over all of the assets of Caelter Enterprises. Following the bankruptcy of Caelter Enterprises, another Canadian corporation, operating under the name 123517 Canada, Inc. purchased most of the assets of Caelter Enterprises from the Royal Trust Company and the Bank of Montreal. The purchaser corporation, 123517 Canada, Inc., later assumed its present name of SMI Industries Canada Ltd. and is the plaintiff in this action.

Plaintiff SMI Industries Canada Ltd. formed an American corporation known as S.M.I. Industries, U.S.A., Inc. in or about September of 1983. S.M.I. Industries, U.S.A., Inc. is the counterclaim defendant herein and operates its business in Watertown, New York under that name. Thus, there is relatively little difference between the operating names of plaintiff's and defendant's facilities, and it is undisputed that both parties distribute competitive products. It is both the similarity in names and in products that give rise to the instant lawsuit.

With regard to the defendant Caelter Industries, Inc., the court notes that one hundred percent of the stock of this corporation is currently held by the Royal Trust Company. Walter O. Lampl, the President of Caelter Industries, Inc., who was also the President of Caelter Enterprises, Ltd., presently has an agreement to purchase this stock from the Royal Trust Company. Thus, the control of both Caelter Industries and Caelter Enterprises in terms of their day-to-day operations has always been with Mr. Lampl.

Caelter Industries, Inc. does business through its two divisions, the Snowblast Division in Denver, Colorado and the SMI New York Division in Watertown, New York. The corporation traces its roots back to two distinct corporations, the American Snowblast Corporation of Denver, Colorado and Sicard Industries, Inc. of Watertown, New York. Through various mergers and/or acquisitions not pertinent to this lawsuit, the current defendant Caelter Industries, Inc. was formed in 1977.

Following the bankruptcy of Caelter Enterprises, Ltd., the Royal Trust Company, through its accounting firm Coopers & Lybrand, prepared a brochure describing the assets of Caelter Enterprises for prospective bidders. This brochure was dated February 11, 1983 and described the Caelter Enterprises assets in twenty-eight general lots or categories. During the pendency of the sale period, Caelter Enterprises' American subsidiary corporation, Caelter Industries, continued to operate its two divisions in Denver and Watertown. It is also undisputed that Caelter Industries con-

tinued to use, as it had in the past, all of the intellectual property at issue herein.

On or about May 24, 1983 plaintiff S.M.I. Industries Canada Ltd. (then known as 123517 Canada, Inc.) entered into the contract which purportedly gave it the intellectual property that it now claims is being infringed by defendant. The contract specifically lists the trademarks "SMI" and "Snowmaster" in addition to U.S. Patent No. 4,178,007 for the "Hydraulic Anti-Shimmy Device for Caster Wheels." The contract also makes specific reference to the Coopers & Lybrand brochure described above. Noticeably absent from the contract, however, is any mention of the trademark "Firemaster." Following the May 24, 1983 purchase plaintiff notified defendant of its acquisition of these properties and demanded that defendant cease its use thereof. In due course this action was commenced on November 17, 1983. *See* Fed.R.Civ.P. 3.

## II. MOTION TO DISQUALIFY DEFENDANT'S COUNSEL

The court will first address plaintiff's motion to disqualify the law firm of Limbach, Limbach & Sutton [Limbach firm]. Plaintiff alleges that the Limbach firm's representation of defendant in this action violates Canons 4, 5 and 9 of the New York State Bar Association's Code of Professional Responsibility and certain Disciplinary Rules promulgated thereunder. Each of plaintiff's challenges stems from the Limbach firm's prior representation in patent and trademark matters of Caelter Enterprises, the parent corporation of the defendant and predecessor-in-interest of the plaintiff.

The Limbach firm's representation of defendant's parent corporation in this specialized area of law began in 1967 and continued until 1982 when Caelter Enterprises was forced into bankruptcy. During the period in question the Limbach firm was closely involved in the process of securing for Caelter Enterprises the patents and trademarks which plaintiff claims to have purchased in 1983. Defendant, who now challenges the validity of these patents as well as plaintiff's ownership rights in the trademarks, has itself been a client of the Limbach firm since 1968. As a result of these long-standing attorney-client relationships, the Limbach firm has gained an intimate knowledge of the business operations of the defendant and its parent corporation. Plaintiff contends that the Limbach firm's long-standing relationship with the defendant's parent corporation gives rise to a number of ethical violations in this case. Plaintiff posits three distinct arguments in favor of disqualification.

First, plaintiff argues that since it succeeded to the patent and trademark rights of the defendant's parent corporation, the representation by the Limbach firm presents a serious conflict of interest and the distinct possibility that confidential information obtained during the former representation will be used to the detriment of the plaintiff in violation of Canon 4.

Second, plaintiff argues that the Limbach firm's representation of the defendant violates Canon 5 because it is evident that members of that firm ought to be called as witnesses at trial. This argument stems from the fact that the Limbach firm represented the defendant's parent corporation in the application for and ownership of the patents and trademarks made the subject of this litigation.

Third, plaintiff argues that the Limbach firm cannot represent the defendant in this action because such representation creates the appearance of professional impropriety in violation of Canon 9. Specifically, plaintiff claims that representation of the defendant places the Limbach firm in the anomolous position of challenging the validity of patents which it secured for a former client and the ownership of trademarks which it registered for the client.

For the reasons set forth below, the court concludes that no ethical violations are present in this case and thus the motion to disqualify is hereby denied.

### A. *Introduction*

As a preliminary matter the court notes that district courts not only have the

inherent power to ensure compliance with the ethical standards set forth in the Code of Professional Responsibility, but also the duty and the responsibility to disqualify counsel for unethical conduct prejudicial to his or her adversaries. *General Motors Corp. v. City of New York*, 501 F.2d 639, 643 n. 11 (2d Cir.1974); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir.1973); *United States ex rel. Sheldon Elec. Co. v. Blackhawk Heating & Plumbing Co.*, 423 F.Supp. 486, 488 (S.D.N.Y. 1976).

The courts of this Circuit, however, are quite hesitant to disqualify an attorney and will do so only upon a showing that the attorney's conduct will "tend to taint the underlying trial." *Board of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). The reason for this judicial reluctance is that disqualification has a serious and immediate adverse effect in that it denies the client his choice of counsel. *Society of Goodwill to Retarded Children, Inc. v. Carey*, 466 F.Supp. 722 (E.D.N.Y.1979). Moreover, the judiciary has come to recognize that disqualification motions are often interposed for tactical reasons, and even when brought in good faith, such motions often result in delay and add substantially to litigation costs. *Id.* at 724.

The determination of a motion to disqualify counsel requires a careful balancing of the client's right to retain the counsel he has chosen, the opposing party's right to untainted litigation, and society's need to maintain the highest standards of professional responsibility for attorneys. *Waterbury Garment Corp. v. Strata Productions, Inc.*, 554 F.Supp. 63, 66 (S.D.N.Y. 1982). The court should not apply these standards mechanically, but should give due regard to the function of regulating the Bar in the interests of justice to all concerned. *J.P. Foley & Co. v. Vanderbilt*, 523 F.2d 1357, 1360 (2d Cir.1975). The court's task in disposing of motions to disqualify counsel, then, is to determine for itself the ends sought to be furthered by the Code provisions invoked, together with the question of whether disqualification in the case *sub judice* will further those ends.

## B. *Canon 4*

Canon 4 of the New York State Bar Association's Code of Professional Responsibility provides that a lawyer "should preserve the confidences and secrets of a client." Disciplinary Rule 4–101(B) specifically enjoins a lawyer from knowingly using such confidences and secrets to the disadvantage of his client or for the advantage of himself or a third party unless the client gives his consent. The self-evident purpose of this ethical precept is to encourage unbridled communication between clients and their attorneys. Without strict enforcement of such high ethical standards, "a client would hardly be inclined to discuss his problems freely and in depth with his lawyer, for he would justifiably fear that information he reveals to his lawyer one day may be used against him on the next." *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d at 570–71.

As noted previously, plaintiff contends that the Limbach firm should be disqualified in this case because plaintiff allegedly has succeeded to the interests of defendant's parent corporation, which the Limbach firm has formerly represented in patent and trademark matters. This is a completely novel theory of disqualification. Plaintiff argues that even though the Limbach firm never represented the plaintiff or any of its affiliated companies, the firm's representation of the instant defendant is adverse to its interests within the meaning of Canon 4 because it "stands in the shoes of the Limbach firm's former client, its predecessor-in-interest."

### 1. Standing

The defendant argues that plaintiff has no standing to challenge the Limbach firm's representation of Caelter Enterprises because no attorney-client relationship ever existed between the Limbach firm and the plaintiff. The court disagrees.

The court believes that the general rule which restricts standing to raise a Canon 4 disqualification motion to one who is a client or former client of the challenged law firm must give way to a maxim that adequately addresses the need to ensure both clients and the general public that lawyers will act within the bounds of ethical conduct. Any attorney has the right and the obligation to bring to the court's attention an alleged violation of a disciplinary rule. Indeed, the Code of Professional Responsibility expressly requires that an attorney come forward if he has knowledge of an actual or potential violation of a disciplinary rule.

Disciplinary Rule 1–103(A) specifically provides that "a lawyer possessing unprivileged knowledge of a violation ... shall report such knowledge to an [appropriate] tribunal...." The First, Fourth and Fifth Circuits have concluded that DR 1–103(A) confers standing on any attorney to challenge a lawyer's representation of a client when he is privy to facts which justify disqualification. *See Kevlik v. Goldstein,* 724 F.2d 844 (1st Cir.1984); *United States v. Clarkson,* 567 F.2d 270, 271 n. 1 (4th Cir.1977); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.,* 563 F.2d 671, 673 (5th Cir.1977); *see also Dunton v. County of Suffolk,* 729 F.2d 903 (2d Cir. 1984) (attorneys are officers of the court and are obligated to adhere to all disciplinary rules and to report incidents of which they have unprivileged knowledge involving potential violations of the disciplinary rules). Defendant's standing argument is thus without merit.

### 2. Disclosure of Confidences

■ Ordinarily an attorney may not "knowingly reveal a confidence of his client or use a confidence of his client to the disadvantage of the client." *Evans v. Artek Systems Corp.,* 715 F.2d 788 (2d Cir. 1983); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 n. 2 (2d Cir.1977). To ensure faithful compliance with this broad ethical precept, any attorney may be disqualified from representing a client if: (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have access to, relevant privileged information in the course of his prior representation of the client. *Evans v. Artek Systems Corp.,* 715 F.2d at 791; *Cheng v. G.A.F. Corp.,* 631 F.2d 1052, 1055–56 (2d Cir.1980), *judgment vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981); Code of Professional Responsibility, Canon 4, DR 4–101(B).

■ Although plaintiff was never represented by the Limbach firm, and thus is not a "former client" within the meaning of Canon 4, it argues nevertheless that by virtue of being an assignee of the defendant's parent corporation it succeeds to the rights of the Limbach firm's former client. Such rights, it is argued, include the attorney-client privilege which formerly existed between defendant's parent and the firm. Although interesting, plaintiff's argument is without merit and unsupported by the case law. Indeed, plaintiff has failed to cite a single case in support of the proposition that an assignee of assets stands in the shoes of its assignor for purposes of Canon 4. The court has, however, located several cases which hold that an assignment of intellectual property does not assign the assignor's attorney to the assignee. *See In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83 (5th Cir. 1976); *Beghin-Say v. Rasmussen,* 212 U.S. P.Q. 615 (Comm.Dec.1980).

The court in *In re Yarn Processing Patent Validity Litigation* was faced with arguments similar to those advanced by plaintiff. In that case the purchaser of patent rights from an inventor sought to disqualify opposing counsel, who had previously represented the inventor, on the basis of potential violations of Canon 4. The challenged law firm had no relationship whatsoever with the purchaser. However,

the purchaser maintained that it had a right to expect that the validity of the patents would not be attacked by the inventor's former counsel. The court disagreed, noting that:

> [P]laintiff ... confuses the nature of the rights and duties implicit in the assignment of the patents with the nature of the rights and duties which arise between an attorney and client. Assignment of the patent does not assign [the law firm] along with it.... The prohibition applied to attorneys against representation of conflicting interests rests on the duties of an attorney arising from the attorney-client relationship. In the absence of this relationship, the duties of loyalty and confidentiality do not arise.... When [plaintiff] was assigned the ... patent it did not receive any assignment of any rights against [the law firm].

*Id.* at 90; *see also Black v. State of Missouri*, 492 F.Supp. 848 at 864 (plaintiffs cannot succeed to position of conflict with attorneys who have never represented them); *International Electronics Corp. v. Flanzer*, 527 F.2d 1288 (2d Cir.1975) (merger of law firm's former corporate client with plaintiff constituted a sale which did not prevent law firm from representing former stockholders of purchased corporation against plaintiff).

In the present case the court fails to see how the plaintiff's receipt of assets from the Limbach firm's former client confers "former client" status upon it within the meaning of Canon 4. No attorney-client relationship has ever existed between plaintiff and the Limbach firm and, therefore, no potential violation of Canon 4 can occur in this case. Were this court to accept plaintiff's arguments it would open the courts to a deluge of spurious disqualification motions without advancing any of the policies which underlie Canon 4. Any purchaser of another firm's assets would be able to raise an adverse representation claim against the seller's counsel in any subsequent litigation involving the transferred assets. Plaintiff's motion brought pursuant to Canon 4 is thus denied.

## C. *Canon 5*

Plaintiff next seeks disqualification based upon Canon 5. The Limbach firm, as specialists in the areas of patent and trademark law, formerly represented Caelter Enterprises with respect to the application and registration of the patents and trademarks which are the subject of this litigation. Because the defendant has challenged the validity of the patents and the plaintiff's ownership rights to the trademarks in its affirmative defenses, the plaintiff argues that the Limbach firm will be forced to testify at trial and, therefore, must be disqualified.

Canon 5 of the New York State Bar Association Code of Professional Responsibility expressly prohibits an attorney who ought to be called as a witness in a trial from participating in that trial. This prohibition is set forth in DR 5–102(A), which provides as follows:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).

Even if a member of a firm ought to be called as a witness, DR 5–101(B) provides that representation may continue

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

■ The test for disqualifying counsel under DR 5–102(A) is not whether counsel *will* be called as a witness, but whether he *ought* to be called as a witness in the proceeding. *MacArthur v. Bank of New York*, 524 F.Supp. 1205 (S.D.N.Y.1981); *Eurocom, S.A. v. Mahoney, Cohen & Co.*, 522 F.Supp. 1179 (S.D.N.Y.1981); *Bottaro v. Hatton Associates*, 528 F.Supp. 1116, 1118 (E.D.N.Y.1981). The phrase "ought to be called as a witness" has been narrowly construed to refer to an attorney "who has crucial information in his possession which must be divulged" in the course of a trial. *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d 530, 539 n. 21 (3d Cir.1976), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977).

■ In the instant case the court fails to see how members of the Limbach firm ought to be called as witnesses at trial. The issues raised in defendant's affirmative defenses relate to newly discovered prior art which is alleged to render the subject patents void for obviousness. Any testimony on the part of the Limbach firm with respect to why the patent office may have failed to discover the existence of any prior art references would be totally irrelevant in this case. The issue before the court is whether the patents are indeed valid, not whether the Limbach firm properly procured the patent licenses in the first instance. The process by which the Limbach firm secured these patents is simply not relevant to any material issue in this litigation.

Even assuming, *arguendo*, that members of the Limbach firm ought to be called as witnesses at trial, the court concludes that disqualification is not appropriate in this case. As noted previously, DR 5–101(B)(4) provides that an attorney may continue representation of his client in a proceeding in which the attorney is called upon to testify if disqualification would work a special and unwarranted hardship on the client by virtue of the distinctive value of the lawyer or his firm as counsel in the case.

In the present case George Limbach has represented the related predecessor corporation of defendant in patent and trademark matters since 1967, and the Limbach firm has represented defendant and its related companies since early in 1968. The attorney-client relationship has become intimate, and the firm has acquired specialized knowledge of defendant, defendant's related companies, and their operations. The Limbach firm's representation of defendant in the present action involves a complex set of legal and factual issues which the firm has been familiar with for many years. At this late juncture it would work a substantial hardship upon the defendant to require it to retain new counsel. Moreover, there is no basis for concluding that the continued representation by the Limbach firm will prejudice the plaintiff in this proceeding in any way or taint the underlying trial. Accordingly, plaintiff's motion to disqualify pursuant to Canon 5 is denied.

D. *Canon 9*

Plaintiff's final argument in favor of disqualification is based upon Canon 9 of the Code of Professional Responsibility which requires an attorney to avoid "even the appearance of impropriety." Plaintiff alleges that the Limbach firm's present challenge to the validity and ownership of patents and trademarks which it originally helped to secure for its former client constitutes conduct giving rise to an appearance of impropriety.

■ While a motion to disqualify opposing counsel may be granted under Canon 9 in the absence of an actual breach of ethics, there must be at least a reasonable possibility that some specifically identifiable impropriety will occur. *Board of Educ. of the City of New York v. Nyquist*, 590 F.2d 1241 (2d Cir.1979); *R–T Leasing v. Ethyl Corp.*, 484 F.Supp. 950 (S.D.N.Y.

1979), *aff'd*, 633 F.2d 206 (2d Cir.1980). This requirement that a lawyer avoid even the appearance of impropriety reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby erode public confidence in the judicial system and the legal profession. *Woods v. Covington County Bank*, 537 F.2d 804 (1976).

■ A realistic view of the present litigation convinces the court that the public's perception of the integrity of the bar and the judicial system is not likely to be undermined by the Limbach firm's present representation of the instant defendant. The court agrees with the defendant that plaintiff's challenges under Canon 9 are a function of a mistaken belief that the Limbach firm is now taking a position with respect to the patents and trademarks which is contrary to the position taken during the procurement of these properties.

With respect to the patent issues in this case, defendant is merely arguing that the patents may be invalid based upon newly discovered art whose existence was not known before or during the pendency of the patent application. As the defendant correctly points out, had these prior art references been known to the Limbach firm prior to the issuance of the patent, both the applicant and the firm would have been duty bound to disclose such information to the Patent Office. There is no suggestion here that this information to the Patent Office. There is no suggestion here that this information was available to either the applicant or the Limbach firm during the pendency of the patent application.

The plaintiff's argument with respect to the trademarks in this case is similarly misplaced. The defendant is not claiming, as plaintiff contends, that the trademarks which it registered for its former client are void *ab initio* or that the former client never had a valid ownership interest in the trademarks. Rather, the defendant is challenging plaintiff's rights to the trademarks based upon the argument that plaintiff simply does not have legal ownership of the trademarks or in the alternative that plain-tiff lost all rights in the trademarks by failing to exercise quality control over the use of the trademarks by its licensees.

There is simply no appearance of impropriety in the Limbach firm positing these legal theories. Moreover, contrary to the arguments set forth by plaintiff, these legal theories are not inconsistent with the firm's former representation of the defendant's parent corporation. Accordingly, the plaintiff's motion to disqualify based upon Canon 9 is hereby denied.

## III. MOTION FOR A PRELIMINARY INJUNCTION

■ It is well established that the object of a preliminary injunction is to preserve the status quo until there can be a hearing on the merits. *Guiness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d 1095, at 1099–1100 (2d Cir.1984); *Sierra Club v. United States Army Corps of Eng'rs*, 732 F.2d 253, at 256–257 (2d Cir. 1984); *Diversified Mortgage Investors v. United States Life Ins. Co. of New York*, 544 F.2d 571, 576 (2d Cir.1976); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 742 (2d Cir.1953). In this Circuit a party requesting a preliminary injunction must meet the test set forth in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir.1979) (per curiam), namely, a demonstration of irreparable harm and "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting the preliminary relief." *Id.* at 72. *See also Sadowsky v. City of New York*, 732 F.2d 312, at 316 (2d Cir.1984); *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, at 63 (2d Cir.1984). Moreover, such a showing is closely scrutinized in patent litigation and the moving party must demonstrate that the patent is "valid beyond question" and infringed. *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 307 (2d Cir.1972); *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 871 (2d Cir.1971),

*cert. denied,* 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973); *see also Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1578 (Fed.Cir.1983).

In the present case plaintiff seeks a preliminary injunction enjoining defendant from utilizing (1) U.S. Patent No. 4,178,007; (2) the various "drawings, designs, patterns, models, dies, matrices and molds" used and destined for use in the manufacture of products bearing the trademark "SMI"; and (3) the trademarks "SMI," "Snowmaster" and "Firemaster." Plaintiff further seeks to enjoin defendant from contacting any customers or potential customers of plaintiff in such a way as to impugn the basic integrity of plaintiff's business. Due to the complexity of these requests and the mulitiplicity of issues contained therein, the court will address these topics separately.

## A. *U.S. Patent No. 4,178,007*

Registered patents carry with them a presumption of validity that requires the party asserting invalidity to bear the burden of overturning that presumption. *See* 35 U.S.C. § 282. Nevertheless, in the context of motions for preliminary injunctions, the moving party bears the heavy burden of demonstrating that the patent is "valid beyond question" and infringed. *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d at 307. To make such a showing the courts have required either a prior adjudication of the patent's validity or long acquiescence to its validity by industry. *Id.; Frommelt Indus., Inc. v. W.B. McGuire Co., Inc.,* 504 F.Supp. 1180, 1180 (N.D.N.Y.1981). In the absence of the above, direct technical evidence proving the patent's validity is sufficient to warrant the granting of preliminary injunctive relief. *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d at 1573; *Jenn-Air Corp. v. Modern Maid Co.,* 499 F.Supp. 320, 323 (D.Del.), *aff'd,* 659 F.2d 1068 (3d Cir.1981) (mem.).

In the present case it is undisputed that there has been no prior adjudication of the validity of U.S. Patent No. 4,178,007. Thus, for plaintiff to obtain its injunction it must demonstrate either long acquiescence to the patent's validity by industry or supply direct technical evidence of the patent's validity through some other source.

Defendant opposes the injunction on numerous grounds. To begin with, defendant argues that the preliminary injunction should not issue because of the undue delay by plaintiff in bringing the instant motion. As to the validity of the patent, defendant argues that there was no acquiescence by industry of the disputed patent. Further, defendant asserts that it has discovered two prior art patents which serve to defeat the subject patent as obvious pursuant to 35 U.S.C. § 103. Lastly, defendant claims that plaintiff has failed to prove infringement. Alternatively, defendant has offered to place into escrow a five percent royalty of the value of the anti-shimmy device on the caster of any product sold in the future which incorporates defendant's current design of the anti-shimmy device. These arguments will be explored seriatim.

As a preliminary matter the court disagrees with defendant's contention that plaintiff is guilty of undue delay in bringing the instant motion. Plaintiff purchased the assets of Caelter Enterprises on May 24, 1983 and brought this lawsuit on November 17, 1983. In this six month period, plaintiff contacted defendant and demanded that defendant cease using the subject intellectual property. Considering the difficulties plaintiff has encountered in obtaining proper documentation from its Canadian representative and the relative complexity of the issues presented by this lawsuit, the court finds that plaintiff's motion for a preliminary injunction is properly before the court. This is so with regard to not only the patent phase of the litigation, but also the trademark, commercial defamation and "drawings, designs ... and molds" phases.

With regard to plaintiff's argument that the subject patent has been considered valid by the relevant industry for a sufficient period of time, the court has

carefully examined the case law and concludes otherwise. While some courts have found commercial acquiescence in such short periods of time as five and one-half years, *see Zenith Laboratories, Inc. v. Eli Lilly & Co.*, 460 F.Supp. 812 (D.N.J.1978), most courts have required substantially more market time than the four year period present in the instant action. *See, e.g., Premo Pharmaceutical Laboratories, Inc. v. USV Laboratories, Inc.*, 481 F.Supp. 193 (S.D.N.Y.) (16 years), *aff'd*, 615 F.2d 1351 (2d Cir.1979) (mem.); *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 324 F.Supp. 715 (S.D.Fla.1971) (period in excess of 11 years), *aff'd*, 460 F.2d 1096 (5th Cir.1972). *See also Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F.Supp. 1298 (D.Del.1981) (preliminary injunction denied where patented product not yet manufactured).

In the present case U.S. Patent No. 4,178,007 was granted by the United States Patent Office on December 11, 1979. The record reveals that the device is not widely utilized in the snow removal industry and is not particularly cost effective. As such, there was not a great deal of industry motivation to attack and/or challenge the patent's validity. *H.J. Ashe Co. v. Bridgeport Metal Goods Mfg. Co.*, 273 F.Supp. 196, 199–200 (S.D.N.Y.1967).

Unlike the case of *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, plaintiff has not demonstrated that the patented product is widely accepted in the industry. Nor has plaintiff shown that the patented product generates large profits. 324 F.Supp. at 718. *See also H.J. Ashe Co. v. Bridgeport Metal Goods Mfg. Co.*, 273 F.Supp. at 200 (noting the high costs of patent litigation and the absence of incentives to challenge certain types of patents). These facts, coupled with plaintiff's failure to provide affirmative technical evidence of the patent's validity and defendant's proof of the patent's obviousness, leads the court to conclude that preliminary injunctive relief is not warranted for U.S. Patent No. 4,178,-007. Plaintiff must demonstrate that the patent in question is valid "beyond question" and infringed. In view of this court's finding that plaintiff has not shown validity

"beyond question," the court makes no finding with respect to infringement. Accordingly, plaintiff's motion for a preliminary injunction enjoining defendant from utilizing U.S. Patent No. 4,178,007 is denied.

## B. *Drawings, Designs and Molds*

■ Paragraph 15(III) of the May 24, 1983 agreement between plaintiff and the representatives of the Coopers and Lybrand recites the transfer of the following properties:

> All of the drawings, designs, patterns, models, dies, matrix and moulds, located throughout the world used and destined for use in the manufacturing of the following products: SMI, Sicard and/or Snowblast.

At first blush it would seem as though plaintiff purchased these assets and would certainly be entitled to an injunction restraining others from utilizing these drawings. However, as will be explored below, there are serious factual questions regarding the interpretation of paragraph 15(III) of the May 24, 1983 agreement.

By an affidavit dated January 4, 1984, Walter O. Lampl, President of defendant Caelter Industries, stated that Caelter Enterprises did not own the subject drawings at the time of the sale. Rather, Lampl urges that his present corporation Caelter Industries purchased these drawings *prior* to their purported transfer on May 24, 1983. Not surprisingly, Robert S. MacKenzie, President of S.M.I. Industries, U.S.A., the American subsidiary of plaintiff, has supplied the court with an affidavit dated January 9, 1984 stating that defendant never owned the drawings but merely used them under a revocable license from Caelter Enterprises. MacKenzie bases his affidavit from his own personal knowledge garnered from his prior employment with defendant.

At this stage of the proceedings the court has before it a significant factual dispute that is incapable of resolution based upon the present record. This court

has recognized long ago that it is unusual to issue preliminary injunctive relief prior to the holding of an evidentiary hearing. *Menley & James Laboratories Ltd. v. Approved Pharmaceutical Corp.*, 438 F.Supp. 1061, 1065 (N.D.N.Y.1977). *See also Forts v. Ward*, 566 F.2d 849 (2d Cir. 1977); *SEC v. Frank*, 388 F.2d 486 (2d Cir.1968); *Sugarhill Records Ltd. v. Motown Record Corp.*, 570 F.Supp. 1217 (S.D. N.Y.1983). Here, determination of the ownership of the subject drawings must come, if at all, after the receipt of the appropriate testimony and/or documentary evidence. Accordingly, plaintiff's motion for a preliminary injunction enjoining defendant from utilizing the drawings referred to in paragraph 15(III) of the May 24, 1983 agreement is denied.

### C. "SMI," "Snowmaster" and "Firemaster"

Plaintiff's motion for a preliminary injunction enjoining defendant from use of these three trademarks is the most hotly contested aspect of this lawsuit. As such, the court must carefully consider the propriety of issuing injunctive relief prior to conducting an evidentiary hearing. *Menley & James Laboratories Ltd. v. Approved Pharmaceutical Corp.*, 438 F.Supp. at 1065; *see also SEC v. Frank*, 388 F.2d at 491.

Defendant's principal objection in this regard concerns its characterization of the transfers of these trademarks. It is argued that the transfer from Caelter Enterprises to the Royal Trust Company and then to plaintiff was a transfer *in gross* and, therefore, invalid. Defendant asserts that since the trademarks were not transferred along with the goodwill of Caelter Enterprises, the transfers amounted to nothing more than a "naked license" and thus were invalid under the Lanham Act, 15 U.S.C. § 1051, *et seq.* To the contrary, plaintiff asserts that the transfer of the trademarks from Caelter Enterprises to the Royal Trust Company and then to plaintiff was proper and that its entitlement to a preliminary injunction is unquestioned.

The court notes that the parties have not questioned the validity of the trademarks per se and that the propriety of their registration is not at issue in this lawsuit.

 Although plaintiff's motion for a preliminary injunction seeks to restrain defendant from using all three of these trademarks, the court believes that a separate discussion of the "Firemaster" trademark is in order. The May 24, 1983 purchase agreement between plaintiff and the agents for the Royal Trust Company recited in great detail those assets of Caelter Enterprises that were being transferred. While "SMI" and "Snowmaster" are mentioned, the court observes that the trademark "Firemaster" is not present in the agreement.

At oral argument on this motion plaintiff's counsel referred to this absence as a "mere scrivener's error." Be that as it may, this is a motion for a preliminary injunction, and the court must adhere to the standards set forth in the *Jackson Dairy* case. With regard to the likelihood of succeeding on the merits, the court at this time can come to no other conclusion but that preliminary injunctive relief should not issue as to the "Firemaster" trademark. This trademark is not mentioned in the purchase agreement, and this court has been supplied with no evidence to support plaintiff's claim of purchase. Though such proof may surface prior to trial, it is not present at this stage of the proceedings, and the court must deny plaintiff's motion to enjoin defendant from using the "Firemaster" trademark.

Defendant's argument with respect to the "SMI" and "Snowmaster" trademarks is three-fold. First, defendant argues that the execution of the trust deed between Caelter Enterprises and the Royal Trust Company in 1977 constituted an *in gross* transfer. Second, defendant argues that even if the 1977 trust deed did not effect a transfer, the May 14, 1983 purchase of Caelter Enterprises' assets by plaintiff constituted an *in gross* transfer. Lastly, defendant argues that, notwithstanding the above, plaintiff "abandoned" its rights to

these trademarks by failing to exercise control over the use of the trademarks following their alleged purchase.

■ With regard to defendant's first argument, the court agrees with plaintiff that the 1977 trust deed did not amount to a transfer at all. Although trademarks are freely assignable as tangible assets, *see generally* J. McCarthy, *Trademarks and Unfair Competition*, § 18:1 (1973), this particular transaction did not amount to an actual transfer of the trademarks from Caelter Enterprises to the Royal Trust Company. Rather, the trademarks were merely used by Caelter Enterprises to secure its indebtedness. The Royal Trust Company never exercised any control over the operation of Caelter Enterprises in terms of the company's use of these trademarks. Moreover, Caelter Enterprises never changed its position vis-a-vis these trademarks following the execution of the trust deed. Thus, since neither of the parties intended the transaction to be a transfer nor treated it as such, this court finds defendant's argument to be without merit.

With regard to defendant's second argument, the court finds that the May 24, 1983 purchase agreement did not amount to an *in gross* transfer of the trademarks. A transfer of a trademark *in gross* is simply one effected without a simultaneous transfer of the goodwill appurtenant to that trademarks. A trademark is merely a symbol of goodwill, *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), and "has no independent significance apart from the good will it symbolized." J. McCarthy, *supra* (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924)). Thus, when a trademark is the subject of an *in gross* transfer, the purchaser obtains only the symbol but not the reality. Since the Lanham Act places an affirmative duty on trademark owners to exercise some degree of control over the trademarks they license, *Dawn Donut Co. v. Hart's Food Stores*, 267 F.2d 358 (2d Cir.1959), the courts have required a simultaneous transfer of both the trademark and its goodwill

in order to preserve the validity of the trademark.

In the present case the May 24, 1983 purchase agreement recites the sale of the "SMI" and "Snowmaster" trademarks as well as a vast majority of the assets of Caelter Enterprises. This additional transfer of assets is an important consideration for the court in determining whether Caelter Enterprises' goodwill was also transferred with the trademarks. J. McCarthy, *supra*, § 18:7; *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 & n. 7 (C.C.P.A. 1978). After a careful review of the purchase agreement, it appears plain that plaintiff acquired the goodwill appurtenant to these trademarks. This acquisition is evidenced by the complete diversity of assets that were the subject of the purchase agreement. Such assets include: a parts inventory; work in progress; finished goods; machinery, tools and equipment; office furniture and equipment; rolling stock; tools, stock in trade and rolling stock; and trademarks, patents, rights, titles and interests. Moreover, the court notes that the assets were found at two different locations and a fair reading of the purchase agreement leads the reader to conclude that the transfer of assets was intended to be all inclusive rather than partial.

This same conclusion is reached with respect to defendant's secondary assertion that an *in gross* transfer was effected when the Royal Trust Company succeeded to the ownership of Caelter Enterprises' assets upon the bankruptcy of the latter in December of 1982. Clearly, a trustee in bankruptcy, a position analogous to that of the Royal Trust Company in December of 1982, has the power to transfer the intellectual property of a debtor. When Caelter Enterprises went bankrupt the Royal Trust Company assumed ownership of all of the assets of Caelter Enterprises. This was done in accordance with the terms of the 1977 Trust Deed which had granted a security interest to the Royal Trust Company. Inasmuch as the 1977 Trust Deed did not amount to a transfer of assets, the

failure of Caelter Enterprises to fulfill its loan obligations caused an automatic transfer of assets. Again, this was a complete transfer of assets rather than a partial transfer of the trademarks without their attendant goodwill. As such the court must reject in toto defendant's assertion that the subject trademarks were rendered invalid by virtue of an *in gross* transfer.

Lastly, the court must address defendant's argument that plaintiff abandoned whatever interest it possessed in the trademarks by failing to exercise direct control over those trademarks. As noted above, the owner of a trademark must protect that trademark from dissolution by controlling those persons authorized to use it. Failure to do so renders the trademark invalid as a mere "naked license." *Societe Comptoir v. Alexander's Dep't. Store*, 299 F.2d 33 (2d Cir.1962) (holding grant of "naked license" to be a fraud on the public and unlawful). Defendant contends in the instant case that abandonment is evidenced by plaintiff's failure to halt defendant's use of the trademarks immediately following the May 24, 1983 purchase agreement.

Defendant argues that since plaintiff was aware of the license agreement between Caelter Enterprises and Caelter Industries *prior* to plaintiff's execution of the purchase agreement, plaintiff should have taken affirmative steps to prevent defendant from continuing to use the trademarks. Instead, defendant argues, plaintiff waited until mid-September to contact defendant and demand that defendant cease its use of the trademarks. In addition, defendant points out that plaintiff waited until November 17, 1983 to commence this action and until December 16, 1983 to file the instant motion for a preliminary injunction. While such arguments appear colorable on their face, they fall short when considered in light of the facts of this case.

Defendant's President Walter O. Lampl was also President of Caelter Enterprises. Mr. Lampl was intimately familiar with the financial problems being experienced by Caelter Enterprises and knew of the purchase of Caelter Enterprises' assets by plaintiff. Thus, defendant's thinly veiled assertion that it is an innocent victim of plaintiff's outrageous and aggressive conduct is belied by the record.

Defendant knew full well that the intellectual property of Caelter Enterprises had been purchased by plaintiff, but defendant continued to use it nevertheless. Moreover, the court believes that the period from May 24, 1983, the date plaintiff purchased the trademarks at issue, until it first *formally* notified defendant that defendant should cease and desist, should not be considered as one of "uncontrolled and naked licensing." This is a relatively short amount of time considering the realities of modern business practices and also considering the fact that plaintiff is a Canadian corporation that was struggling to establish its American subsidiary at the same time that it was attempting to restrain defendant's actions.

Plaintiff can hardly be said to have slept on its rights against defendant when defendant did not either rely on the passage of time or take some action in detrimental reliance on plaintiff's failure to act. Indeed, the record indicates that defendant considered changing its operating name following the purchase by plaintiff of Caelter Enterprises' assets so as to avoid the possibility of receiving a cease and desist letter. *See* Reply Affidavit of Robert S. MacKenzie dated Jan. 9, 1984 at ¶ 18. Based upon these facts, together with a review of the record as a whole, the court concludes that plaintiff did not abandon its interest in the trademarks at any time and more specifically in the time between its purchase of Caelter Enterprises' assets and the commencement of this action.

Returning to the standards for a preliminary injunction as set forth in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 597 F.2d at 72, the court believes that plaintiff has demonstrated both irreparable harm and a likelihood of success on the merits with respect to its trademark claims for "SMI" and "Snowmaster." Irreparable harm is present in that there is substantial

likelihood of confusion between the plaintiff and the defendant's use of the trademarks. In addition, plaintiff cannot control the quality of goods being sold by defendant under these two trademarks. Lastly, irreparable harm can be presumed from the demonstration of plaintiff's ability to succeed on the merits. *See generally Guiness & Sons, PLC v. Sterling Publishing Co.*, 732 F.2d, at 1099.

As to the success on the merits, the court believes that the May 24, 1983 purchase agreement was valid and not a transfer *in gross*. Defendant has not denied that it is presently utilizing the "SMI" and "Snowmaster" trademarks. Accordingly, the court believes that preliminary injunctive relief should issue, and defendant is hereby restrained from using the trademarks "SMI" and "Snowmaster" during the pendency of this action or until further order of this court. Pursuant to Fed.R.Civ.P. 65(c), the parties are hereby directed to appear before the court on May 24, 1984 at 4:30 p.m. for the purposes of setting an appropriate bond for the payment of costs and damages.

### D. *Commercial Defamation*

■ The essence of this aspect of plaintiff's motion for a preliminary injunction centers around a letter defendant sent to its customers on or about October 19, 1983. The letter, signed by defendant's President Walter O. Lampl, is set forth in full below.

You probably have been contacted recently by a new company having a name similar to ours, and operating out of the same geographic area as we do. There were probably some statements made to you claiming that this new company has acquired certain drawings, patents, etc., relating to SMI equipment. We understand that this has created a lot of confusion among our customers. We would like to set the record straight as follows:

1. SMI New York, a division of Caelter Industries, Inc. has not sold and has no intention of selling any of its drawings or other manufacturing records, nor

does it for this matter have any intention to sell any of its other assets.

2. Caelter Industries, Inc., through its SMI New York division is the *only* company which has in its files the specific drawings, bills of material, etc. which were used to produce the specific machine(s) used by your organization. Only SMI New York maintains a specific and complete history file for each piece of equipment ever sold.

Enclosed you will find a news release recently issued by our company. I trust this will shed additional light on the present situation.

We are most appreciative of your past business and hopeful to be able to serve you in the future.

The news release referred to in the later portion of the letter concerns a state court injunction against two former employees of defendant now employed by plaintiff's Watertown, New York subsidiary. Specifically, the injunction restrained these two employees from interfering with their former employer's business or contractual relations. The former employees were further enjoined from divulging any confidential information or trade secrets.

As only a cursory reading of the above discloses, the parties and their subsidiary companies are currently embroiled in a bitter fight over both products and territory. Robert S. MacKenzie, currently the President of plaintiff's subsidiary S.M.I. Industries U.S.A., Inc., was one of the former employees who was the subject of the above-described state court injunction. Thus, MacKenzie left defendant's employ and became a principal in its newly created competitor company.

With regard to the letter itself, the court notes that it was sent approximately one month prior to the commencement of this action on November 17, 1983. In addition, it would appear as though the statements contained therein are true insofar as they state that defendant has not sold nor does it intend to sell any of its drawings or designs. Moreover, as the affidavit of Dennis P. Hennigan confirms, a state court

injunction was in fact obtained against MacKenzie and another former employee of defendant Caelter Industries, Inc. The problem with the letter and its tone, however, is that its implication is one that plaintiff is a carpetbagger who has come into the area solely to disrupt defendant's business. Such a portrayal is clearly not true as plaintiff is a legitimate business concern that claims rightful ownership of the intellectual property which is the subject of this lawsuit.

While the court recognizes that the letter and accompanying news release were sent *prior* to the institution of these proceedings, defendant was surely aware at the time that plaintiff disputed its rightful ownership of the drawings and patents. As such, it was misleading for defendant not to have included in its letter a claim that "the other business" has asserted a claim to this property. Defendant need not have stated that it believed plaintiff's claims to have substance, but it should have at least disclosed the existence of such claims.

Since the failure of defendant to disclose the existence of competing claims to the intellectual property at issue in this lawsuit may have the tendency to impugn the basic integrity of plaintiff's business, the court believes that injunctive relief is appropriate. Thus, the question remains as to the form such injunctive relief should take. Plaintiff has not requested that defendant cease contacting any of its customers. Rather, plaintiff merely requests an injunction restraining defendant from portraying plaintiff is a false light. Such a request is eminently reasonable and will prove to be no hardship to defendant. Accordingly, during the pendency of this action or until further order of this court, defendant shall be enjoined from contacting customers in the relevant market in such a way as to portray plaintiff and its business in a false light. Contacts with customers should, consistent with this decision, be fair and accurately explain the facts of this litigation.

## IV. CONCLUSION

In sum, the court hereby denies plaintiff's motion for an order disqualifying the law firm of Limbach, Limbach & Sutton from representing defendant in this action. The court finds that the Limbach firm has breached no ethical duties it owes to any present or former clients and has violated no Canons of the Code of Professional Responsibilty. With respect to plaintiff's motion for a preliminary injunction, the court hereby grants the motion in part and enjoins defendant from utilizing the trademarks "SMI" and "Snowmaster" during the pendency of this litigation or until further order of this court. Defendant is further enjoined from contacting present or future customers of plaintiff in such a way as to portray plaintiff and its business in a false light. The motion for a preliminary injunction is hereby denied in all other respects.

The parties are hereby directed to appear before the court on May 24, 1984 at 4:30 p.m. for the purposes of determining the amount of a bond to be posted by plaintiff pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

It is so Ordered.